WILLARD HELBURN, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 38865. Promulgated June 30, 1953.

*Arnold R. Cutler, Esq., LaRue Brown, Esq.,* and *George B. Lourie, Esq.,* for the petitioner.
*Lester H. Salter, Esq.,* for the respondent.

### OPINION.

MURDOCK, *Judge:* The Commissioner determined a deficiency of $42,461.82 in income tax of the petitioner for its fiscal year ended November 30, 1949. The only issue for decision is whether the petitioner realized taxable income of $84,047.36, the difference between the dollar value of pounds sterling borrowed to purchase skins and dollars expended to purchase pounds sterling to repay the loan. The facts have been presented by a stipulation which is adopted as the findings of fact.

The petitioner filed its corporate income tax return for its fiscal year ended November 30, 1949, with the collector of internal revenue for the district of Massachusetts. It maintained its books and records and reported its income on an accrual method of accounting. It is engaged in the manufacture and sale of leather and leather products in Peabody, Massachusetts.

The petitioner, on April 13 and May 25, 1949, made successful bids on lots of lambskins at Government auctions in New Zealand. The lambskins were for use in the petitioner's regular business.

Mair & Company, Ltd., hereafter called Mair, a firm in New Zealand, was employed by the petitioner on a commission to make arrangements to pay for the skins and ship them to the petitioner. Brown Brothers Harriman & Co., hereafter called Harriman, is a firm engaged in com-

mercial banking in Boston. Brown Shipley & Co., Limited, hereafter called Shipley, is a commercial bank located in London, England, with which Harriman corresponded but had no other affiliation. The petitioner established credit with Harriman, and Harriman issued letters of credit to Mair authorizing it to draw on Shipley for pounds sterling provided that it accompany the drafts by bills of lading for skins shipped to the petitioner.

The vendors of the skins invoiced them to Mair as instructed by the petitioner. Mair paid the vendors in New Zealand currency with its own funds, took possession of the skins, placed each lot aboard ship, received bills of lading, prepared invoices to the petitioner, and presented all necessary documents and a sight draft on Shipley for the amount of the invoice in pounds sterling at the Bank of New South Wales. The bank negotiated the sight drafts, thereby paying Mair in New Zealand currency and forwarded the sight drafts, the invoices, and the bills of lading to Shipley, which paid them in pounds sterling. The bank, at the same time, sent the original bills of lading and other shipping documents to Harriman in Boston. Shipley notified Harriman by cable that it had paid the sight drafts. Harriman notified the petitioner of its obligation to Shipley resulting from that payment.

The petitioner then requested Harriman to procure acceptance of time drafts in payment of that obligation, and Shipley agreed to accept and thereafter did accept drafts at 120 days' sight, drawn in pounds sterling, payable in London, and endorsed in blank by the petitioner. Shipley negotiated those drafts in the London market thereby repaying itself in pounds sterling for the drafts drawn upon it by Mair.

Harriman, upon receipt of the documents, either from the Bank of New South Wales or from Shipley, whichever set arrived first, endorsed the bills of lading and forwarded them to the petitioner with the applicable invoices and other shipping documents for the skins.

The petitioner, upon receipt of the invoices, recorded each purchase on its books in pounds sterling and in dollars at the rate of exchange prevailing as of the date of the invoice. The rate of exchange on all dates material hereto, prior to September 18, 1949, was $4.04 per pound sterling. The foregoing events occurred prior to September 18, 1949.

The petitioner mingled the skins as it received them with others in its stock for use in the usual course of its business.

The pound sterling was devalued on September 18, 1949, and the rate of exchange at that time became and remained at all subsequent times material hereto $2.81 per pound sterling.

The petitioner, after September 18, 1949, as the 120-day drafts became payable in pounds sterling in London, purchased pounds sterling through Harriman with dollars, at the rate of $2.81 per pound.

and Shipley, upon receiving those pounds sterling, discharged its obligation as acceptor of each draft by paying pounds sterling to the holder thereof.

Harriman subsequently billed the petitioner for its commissions, Shipley's commissions, the discount involved in the negotiation by Shipley of the 120-day drafts, and the cost of stamps required by English law, which bills were paid by the petitioner.

The petitioner, at the end of the taxable year, made entries in its books aggregating the following amounts:

    Dr.  Drafts payable_____ $276,108.20
    Cr.  Cash _____  $192,060.84
    Cr.  Other income_____    84,047.36

The drafts payable figure represents the amount of the drafts for pounds sterling stated in dollars at the exchange rate of $4.04 applicable at the time the pounds sterling were borrowed. The cash item represents the dollars later required to purchase sufficient pounds sterling at the exchange rate of $2.81 in order to pay the sight drafts. The $84,047.36 is the difference between the other two figures which the Commissioner contends should be included in the taxable income of the petitioner for the taxable year.

The Commissioner, in determining the deficiency, added $102,825.99 to income, but now concedes that he should have included only $84,047.36. The explanation which he gave in the notice of deficiency for including the latter amount is as follows:

To adjust purchases to reflect the actual expense paid or incurred during the taxable year.

In Schedule "M" of your income tax return, item 20 (b) you reported "Foreign Exchange" $84,047.36 as nontaxable income. * * *

You purchased certain goods at auction in New Zealand and prices were quoted in British pounds sterling. You entered the purchases on your books in American dollars by converting the pound figure at the prevailing rate of exchange at the date of purchase.

On or about September 18, 1949 the British pound sterling was devalued to a point where its equivalent value in American money was about $2.80. The rate of exchange was formerly at about $4.04.

At the time of devaluation you had a credit balance in your drafts payable account of $338,134.62. During the balance of your fiscal year ended November 30, 1949 you made cash disbursements of $192,060.84 which were recorded on the books as follows:

    Dr.  Drafts payable_____ $276,108.20
    Cr.  Cash_____  $192,060.84
    Cr.  Other income_____    84,047.36

Both parties agree that the cost of the skins was correctly recorded on the books of the petitioner and reported in its income tax returns at the amount of pounds sterling paid for the skins reduced to dollars at the exchange rate of $4.04 which prevailed at all times material hereto

prior to September 18, 1949. *Bernuth Lembcke Company, Inc.*, 1 B. T. A. 1051. The petitioner wants to use that amount, representing what it would have paid for the skins in dollars had it not borrowed from or through Shipley, as the cost of the skins to it, but it does not want to report as income the difference between that amount and the smaller number of dollars which it used to pay off the loans. It relies upon *B. F. Goodrich Co.*, 1 T. C. 1098. The petitioner there borrowed 11,000,000 francs from a Paris bank for the benefit of its French subsidiary, purchased 11,000,000 francs for $514,162.50 some years later and while the loan to the subsidiary was still outstanding, and used those francs to repay the loan to the bank. The Commissioner pointed out that the $514,162.50 was less than the amount of dollars into which the 11,000,000 francs could have been converted at the exchange rate in effect when those francs were borrowed and held that the difference between those two amounts of dollars was income to the petitioner at the time it paid off the loan. This Court sustained the petitioner's contention that it had realized no such income. If the subsidiary had returned the 11,000,000 francs to the petitioner and the latter had used those francs to repay the bank, the difference between the 11,000,000 francs expressed in terms of dollars at the exchange rate at the time of the borrowing and at the time repaid would be purely theoretical and unreal as a gain or loss for income purposes. The Court felt that the alleged gain was also unreal where the francs borrowed were advanced as francs to the French subsidiary, that transaction remained open, and dollars were used to buy francs to repay the bank. The cases of *Bernuth Lembcke Company, Inc.*, *supra*, and *The Joyce-Koebel Co.*, 6 B. T. A. 403, were cited in the *Goodrich* case for the proposition that "foreign currency may be treated as property for income tax purposes, and transactions in it may result in gain or loss just as may transactions in any other property." The present case bears a closer resemblance to those two cases than to the *Goodrich* case.

The Commissioner contends that the petitioner realized taxable gain from borrowing pounds sterling, using them to discharge obligations which it recorded on its books at $276,108.20 and which would have required the use of $276,108.20 at the then rate of exchange to discharge, and later repaying those loans by spending only $192,060.84 to buy sufficient pounds sterling at the exchange rate of $2.81 to repay the loans. He points to the similarity between such transactions and a short sale and argues that this was a profitable taxable transaction in foreign exchange. If the petitioner had borrowed pounds sterling, had exchanged those pounds at the prevailing rate of $4.04 into $276,108.20, and later had purchased sufficient pounds sterling to repay the loans at the lower rate of $2.81, it would have had a profit of $84,047.36 from dealing in foreign exchange, regardless of what use it

might have made of the dollars obtained from the borrowing. The petitioner did substantially that. The only difference is that instead of converting the borrowed pounds sterling into American dollars, it used those borrowed pounds sterling to discharge an obligation which otherwise would have required the use at that time of $276,108.20 and which it recorded on its books at $276,108.20. That difference seems immaterial in determining whether the petitioner had a profit from its transactions in the foreign exchange. It was held in *The Joyce-Koebel Co., supra,* that similar transactions in foreign exchange resulted in taxable income, and that case is not distinguishable in principle on that point. There, the credit was extended by the seller, while here it was extended by others, a difference which would not make the present case a weaker one for the Commissioner. See also *Bernuth Lembcke Company, Inc., supra.* It is held, following those two cases, that the petitioner had taxable income of $84,047.36 during the taxable year from its transactions in foreign exchange.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

---

Opper, *J.*, concurring: *North American Mortgage Co.*, 18 B. T. A. 418, has remained apparently undisturbed as a precedent for many years. But it has long since lost its authority and in my judgment should be expressly repudiated. It is inconsistent with the present result and this accordingly appears to me an appropriate occasion for such a declaration.

In the *North American Mortgage* case Dutch guilders were converted into dollars which were loaned in this country and repaid without gain or loss. Had the transaction stopped there it might be said that the loan and repayment had occasioned no taxable consequence, and that the transaction in foreign exchange was as yet incomplete. That was in fact the situation in *B. F. Goodrich Co.*, 1 T. C. 1098, and constitutes the distinction from the present proceeding. See Roberts "Borrowings in Foreign Currency," 26 Taxes (November 1948) 1033, 1037. But in the *North American Mortgage* case the dollars acquired in repayment of the loans were then reconverted to Dutch guilders at a profit due to a more favorable rate of exchange. It is this gain on the foreign exchange transaction which should have been taxed in the *North American Mortgage* case and which is being taxed here, as I think, correctly.

A page or at least a paragraph of history may be helpful as an explanation. After the decision in the *North American Mortgage* case and in reliance upon it *Norfolk Southern Railroad Co.*, 22 B. T. A. 302, was decided, holding that no gain would be realized from a loan

and repayment. Another authority upon which that case relied was *Kirby Lumber Co.* which had in the meantime been decided by the Board of Tax Appeals, 19 B. T. A. 1046. After the last mentioned decision was reversed, *United States* v. *Kirby Lumber Co.*, 284 U. S. 1, the *Norfolk Southern Railroad Co.* case was in turn modified for similar reasons (C. A. 4) 63 F. 2d 304, certiorari denied 290 U. S. 672. Although the subject has since led to some collateral approaches from time to time, the question has so far as I know had no direct discussion in any published case. See *General Motors Corporation*, 35 B. T. A. 523; *Foundation Co.*, 14 T. C. 1333; *American Pad & Textile Co.*, 16 T. C. 1304; *Seaboard Finance Co.*, 20 T. C. 405.

There seems to me no reason to disturb the well-established principle of such cases as *Bernuth Lembcke Company, Inc.*, 1 B. T. A. 1051, nor indeed to suggest without qualification in the words of *B. F. Goodrich*, *supra*, 1103, that "mere borrowing and returning of property does not result in taxable gain." Cf. Kades, "Devaluation Revalued," 28 Taxes (April 1950) 365. In both such situations a collateral transaction in foreign exchange may be involved. See, e. g., *International Mortgage & Investment Corporation*, 36 B. T. A. 187. The full scope of a taxpayer's gain or loss will not be given effect in his tax liability unless the foreign exchange transaction is also dealt with. See *James A. Wheatley*, 8 B. T. A. 1246. There is nothing inconsistent in the two concepts. I agree with the present conclusion but consider that the state of the law should be clarified by an express repudiation of the theory of the *North American Mortgage* case.