**WILLARD HELBURN, Inc.**
v.
**COMMISSIONER OF INTERNAL REVENUE.**
No. 4796.

United States Court of Appeals, First Circuit.
July 22, 1954.

George B. Lourie, Boston, Mass. (Arnold R. Cutler and LaRue Brown, Boston, Mass., on the brief), for petitioner.

Davis W. Morton, Jr., Sp. Asst. to Atty. Gen. (H. Brian Holland, Asst. Atty. Gen., and Ellis N. Slack and Lee A. Jackson, Sp. Assts. to Atty. Gen., on the brief), for respondent.

Before MAGRUDER, Chief Judge, and WOODBURY and HARTIGAN, Circuit Judges.

MAGRUDER, Chief Judge.

We have for review a decision of the Tax Court of the United States, 20 T.C. 740, determining a deficiency of $35,325.95 in income taxes of Willard Helburn, Inc., for the fiscal year ending November 30, 1949. The only issue to be considered is whether the Tax Court correctly ruled that petitioner, due to the devaluation of the pound sterling from $4.04 to $2.81 on September 18, 1949, realized additional taxable income in the sum of $84,047.36 in a transaction incident to the purchase by petitioner of certain lots of lambskins in New Zealand in April and May of the fiscal year in question.

The facts are covered by a stipulation of the parties, and are not in dispute:

Petitioner is a Massachusetts corporation engaged in the manufacture and sale of leather and leather products, with its principal place of business in Peabody, Massachusetts. It filed its corporate income tax return for its fiscal year ending November 30, 1949, with the Collector of Internal Revenue for the District of Massachusetts, reporting in this return a taxable net income of $27,413.68. It maintained its books and records and reported its income on an accrual method of accounting.

On April 13, 1949, and on May 25, 1949, petitioner successfully bid on various lots of lambskins up for sale at auctions in Wellington, New Zealand. Mair & Company Ltd., a New Zealand firm, acted as agent of petitioner, on a commission basis, to effect all arrangements for the acquisition of the skins and their shipment to petitioner, including payment for the skins, booking of shipping space, and clearance of all necessary commercial and government shipping documents in New Zealand.

Having previously established credit with Brown Brothers Harriman & Co., a commercial banking firm in Boston, Mass., petitioner procured from that firm on April 21, 1949, and on May 31, 1949, two letters of credit issued to Mair & Company Ltd. authorizing it to draw on Brown, Shipley & Co., Limited, for pounds sterling provided that it accompany the drafts by bills of lading for skins shipped to the petitioner. Brown, Shipley & Co., Limited, a commercial bank in London, England, acted as London correspondent of Brown Brothers Harriman & Co. Duplicate originals of these letters of credit were transmitted to Brown Shipley, and advices with respect thereto were sent by cable to the Bank of New South Wales, Christchurch, N. Z. On April 25, 1949, and June 1, 1949, petitioner entered into customers' agreements with Brown Brothers Harri-

man (the form of which agreements was set forth on the reverse side of the letters of credit above mentioned).

Acting upon instructions from petitioner, the vendors of these skins invoiced each lot which had been bid in by petitioner to Mair & Company in New Zealand currency. Upon receipt of each respective invoice, Mair & Company booked shipping space for the particular lot of skins and prepared the necessary export papers. With its own funds it then paid the vendors in New Zealand currency, took possession of the skins, and, duly placing each lot aboard ship, received bills of lading. Thereafter Mair & Company prepared its invoices to petitioner. It then presented at the Bank of New South Wales all the documents and sight drafts in pounds sterling on Brown Shipley for the respective amounts of the invoices.

The Bank of New South Wales negotiated the sight drafts, thereby paying Mair & Company in New Zealand currency; and forthwith forwarded the sight drafts, accompanied by commercial invoices and bills of lading, to Brown Shipley, which paid the drafts in pounds sterling. At the same time as it forwarded the sight drafts to Brown Shipley, the Bank of New South Wales sent the original bills of lading and other documents to Brown Brothers Harriman in Boston.

When Brown Shipley in London paid these sight drafts, it notified Brown Brothers Harriman of such fact by cable, and upon notification by Brown Brothers Harriman of its obligations to Brown Shipley by reason of such payments, petitioner then requested Brown Brothers Harriman to procure from Brown Shipley the acceptance of time drafts in payment of such obligations.

Pursuant thereto, Brown Shipley at the request of Brown Brothers Harriman agreed to accept and thereafter did accept drafts at 120 days sight, drawn and endorsed in blank by petitioner, and payable in London in pounds sterling. Upon such acceptance, Brown Shipley negotiated these drafts in the London market to effect its repayment in pounds sterling of the sight drafts which had been drawn on it by Mair & Company.

Brown Brothers Harriman, upon receipt of the documents from the Bank of New South Wales, endorsed the bills of lading and forwarded the same to petitioner with the applicable invoices and other shipping documents for the respective lot or lots of skins, together with trust receipts pursuant to the customers' agreements between Brown Brothers Harriman and petitioner. As each set of invoices and shipping documents was received by petitioner, it signed such a trust receipt.

Also, upon receipt of the Mair & Company commercial invoices, petitioner recorded on its books each purchase in pounds sterling and in dollars at the rate of exchange prevailing as of the date of the respective invoices, and made a corresponding entry to "Drafts Payable". (Since all of said invoices were dated prior to September 18, 1949, the applicable rate of exchange was $4.04 per pound sterling.)

As each lot of skins was received by petitioner, it was mingled with petitioner's stock in trade for use in the usual course of petitioner's business.

The pound sterling was devalued on September 18, 1949, from $4.04 to $2.81.

Brown Brothers Harriman notified petitioner of each date when payment of the 120-day sight drafts would be payable in pounds sterling in London, and petitioner thereupon effectuated payment of said drafts by purchasing pounds sterling through Brown Brothers Harriman with dollars at the current rate of exchange ($2.81), which by ordinary commercial processes were received by Brown Shipley in London. Brown Shipley then discharged its obligation as acceptor of each draft by payment in pounds sterling to the holder thereof.

Petitioner as of the end of the taxable year (November 30, 1949) had

made entries in its books aggregating the following amounts:

Dr. Drafts Payable   $276,108.20
    Cr. Cash            $192,060.84
    ·Cr. Other Income   $ 84,047.36

The figure "Drafts Payable" represented the amount of the drafts for pounds sterling stated in dollars at the exchange rate of $4.04 applicable at the time the pounds sterling were in effect borrowed from Brown Shipley. The cash item represented the dollars later required to purchase sufficient pounds sterling at the lower exchange rate of $2.81 in order to pay the 120-day sight drafts. The item of $84,047.36, denominated in petitioner's books "Other Income", is the difference between the foregoing two items, which the Commissioner contends should be included in the taxable income of petitioner for the fiscal year in question.

It seems to us that taxwise there are two possible ways in which the foregoing events might be viewed:

(1) The purchases of the skins in New Zealand and the various financial arrangements whereby petitioner ultimately discharged in dollars its obligations arising out of such purchases might be regarded as a single integrated transaction. So regarded, the cost of the skins, as raw materials added to petitioner's inventory during the taxable year, was actually a great deal less, in terms of dollars paid out by petitioner for the goods, than would have been the case had the relationship between the dollar and the pound sterling remained as it was when the skins were purchased in New Zealand in April and May of 1949. Under this tax treatment, the pecuniary advantage which petitioner gained from the devaluation of the pound on September 18, 1949, would in the ordinary case, at least, have been duly reflected in increased net profits taxable to petitioner for the fiscal year in question.

(2) The purchases of the skins in New Zealand might be viewed separately and distinct from the subsequent financial arrangements between petitioner, Brown Brothers Harriman, and Brown Shipley.

Thus, when Mair & Company, as agent for petitioner, paid the New Zealand vendors for the skins, petitioner would take as its costs for the goods added to its inventory in the taxable year the amounts paid therefor by the New Zealand agent (plus commissions, shipping charges, etc.), translated into dollars at the then current rate of exchange between the dollar and the pound sterling ($4.04). But when Brown Shipley paid in pounds sterling the amounts of the sight drafts drawn on it by Mair & Company, pursuant to the letters of credit, Brown Brothers Harriman came immediately under an obligation to reimburse Brown Shipley the amounts of the pounds sterling thus paid; and petitioner, under its contract arrangements with Brown Brothers Harriman, came under an immediate corresponding obligation to supply Brown Brothers Harriman with enough dollars at the then current rate of exchange ($4.04) to enable Brown Brothers Harriman to reimburse Brown Shipley in pounds sterling. If petitioner, not having sufficient dollars to satisfy this obligation immediately, had borrowed the requisite dollars on 120-day promissory notes, and had used these borrowed dollars to satisfy its obligation to Brown Brothers Harriman, the petitioner would then not have stood to gain or lose by any supervening change in the dollar-pound sterling exchange rate during the 120-day interval. But petitioner did not do that. Instead, it satisfied its obligation to Brown Brothers Harriman by persuading Brown Shipley to accept a series of drafts at 120 days sight, drawn and endorsed in blank by petitioner, and payable in London in pounds sterling. By this arrangement, petitioner necessarily involved itself in a speculation in foreign exchange. As things turned out, petitioner gained by the speculation, for the devaluation of the pound sterling on September 18, 1949, enabled petitioner, when the 120-day sight drafts became due, to purchase the necessary covering pounds sterling for $84,047.36 less than would have been the case had the exchange rate remained constant. Considering the all-embracing definition of

"gross income" in § 22(a) of the Internal Revenue Code, 26 U.S.C.A., it seems to us that this windfall item of $84,047.36, entered in petitioner's books as "Other Income" for the taxable year, is even more obviously taxable income than was the balance sheet improvement held taxable in United States v. Kirby Lumber Co., 1931, 284 U.S. 1, 52 S.Ct. 4, 76 L.Ed. 131.

In its corporate income tax return for the year in question, petitioner rejected the first of the two alternatives suggested above; it reported its costs for the lambskin purchases figured on the basis of the higher, old exchange rate of $4.04. In the stipulation of facts which the Commissioner and the taxpayer joined in submitting to the Tax Court, it was agreed that the costs of the skins, thus computed, were correctly reported in petitioner's income tax return. In view of the stipulation, we shall assume, for purposes of the present case, that this was so. But, as the Tax Court held, and, in accordance with the second of the above alternatives, that leaves petitioner taxable on the item of $84,047.36 representing petitioner's gain during the taxable year on its speculation in foreign exchange, as above explained.

Before us, as before the Tax Court, petitioner put itself in the impossible position of asking to have it both ways. As stated by Judge Murdock in the opinion of the Tax Court, petitioner wants to use the amount representing what it would have paid for the skins in dollars at the exchange rate of $4.04 "had it not borrowed from or through Shipley, as the cost of the skins to it, but it does not want to report as income the difference between that amount and the smaller number of dollars which it used to pay off the loans."

We have treated the case as one of first impression, for we are aware of no authoritative precedent which we would be obliged to follow. The only case in the Supreme Court which might be thought to be remotely relevant is Bowers v. Kerbaugh-Empire Co., 1926, 271 U.S. 170, 46 S.Ct. 449, 70 L.Ed. 886, a frequently criticized and not easily understood decision. In that case the corporate taxpayer, prior to World War I, had borrowed money from a bank in Germany, repayable in marks. The marks so borrowed were immediately converted into dollars and advanced by the taxpayer to a wholly owned domestic subsidiary for the performance of certain construction contracts. The business enterprise of the subsidiary was unsuccessful and the full amount of the advances from the parent corporation was lost. Subsequently, after the great depreciation in the value of the mark following World War I, the corporate taxpayer applied the necessary dollars to purchase devalued marks with which it repaid the earlier loan. The Supreme Court held, that the difference resulting from the fall of the mark between the amount borrowed and the amount repaid, in American money, was not taxable as income since the "result of the whole transaction was a loss." 271 U.S. at page 175, 46 S.Ct. at page 451. The Court pointed out that the loss "was less than it would have been if marks had not declined in value; but the mere diminution of loss is not gain, profit or income." We think the rationale of Bowers v. Kerbaugh-Empire Co. is not applicable to the case at bar, since the present taxpayer has made no contention that the net result of its transaction in purchasing lambskins with borrowed foreign exchange was a loss greater than the income realized by reason of petitioner's profitable repayment of the loan, or even any loss at all. The stipulation of facts, which was all the evidence there was before the Tax Court, is silent on how the entire lambskin transaction ultimately resulted with respect to profit or loss. The other cases cited to us are all decisions of the Tax Court. We shall not undertake to analyze them in detail or to reconcile them. They are considered at length in the majority and concurring opinions in the Tax Court. Whether or not the Tax Court decisions enunciate with sufficient clarity and consistency the guiding principles to be applied in

this field of the tax law, we are satisfied that the decision of the Tax Court in the present case was clearly right.

The decision of the Tax Court is affirmed.