**KENTUCKY & INDIANA TERMINAL RAILROAD COMPANY, Plaintiff-Appellee,**

**v.**

**UNITED STATES of America, Defendant-Appellant.**

No. 15208.

United States Court of Appeals Sixth Circuit.

April 7, 1964.

Louis Seelbach, Louisville, Ky., for appellant. Gerald Kirven, Louisville, Ky., on brief; Middleton, Seelbach, Wolford, Willis & Cochran, Louisville, Ky., of counsel.

John B. Jones, Jr., Dept. of Justice, Washington, D. C., for appellee. Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, David O. Walter, Carolyn R. Just, Attys., Dept. of Justice, Washington, D. C., William E. Scent, U. S. Atty., Louisville, Ky., on brief.

Before CECIL, Chief Judge, PHILLIPS, Circuit Judge, and FREEMAN, District Judge.

FREEMAN, District Judge.

In 1911, the Kentucky & Indiana Terminal Railroad Company, plaintiff-appellee herein, sold an issue of gold sterling bonds secured by a mortgage on its properties, to mature in 1961. These bonds were sold for English pounds sterling, were payable in pounds sterling, and each bond had a par value of 100 pounds. For each pound of the sales price of the bonds, the plaintiff received $4.8666, the dollar value of the pound in 1911, and set up its obligation accordingly in dollars on its books. In 1916 and 1917, all except 3925 of such bonds then outstanding were stamped with a legend, making them payable in dollars at the fixed rate of $4.8665 per pound sterling. None of the bonds here in issue were so stamped.

On or about September 1, 1949, the English pound sterling was devalued to $2.80 per pound. During the year 1951, plaintiff purchased in the open market 438 of the unstamped bonds, having a total par value of 43,800 pounds and thereby realized a gain of $105,623.42, being the difference between the basis of the bonds and the cost of acquisition. Of the 438 bonds so purchased, 196 were purchased by plaintiff or its agent in New York and paid for in United States currency; 63 were purchased by plaintiff's agent in London and paid for in currency of Great Britain; and 179 were delivered to plaintiff's agent in London, but were paid for in New York in United States currency. All 438 bonds were purchased for retirement and were cremated by plaintiff. The purchase of such bonds by plaintiff was either proposed, discussed, authorized, ratified or voted upon at various meetings of plaintiff's Board of Directors, and the subject was first brought before the Board by plaintiff's President on October 25, 1949.

On March 17, 1952, when plaintiff filed its federal income tax return for the year 1951, it excluded from its gross income the said sum of $105,623.42, claiming this to be a gain realized in 1951 attributable to the discharge of its own indebtedness under Section 22(b) (9) of the Internal Revenue Code of 1939, and, with the return, pursuant to Section 22(b) (9), filed United States Treasury Form 982 requesting that the amount of such profit be applied to the reduction of the basis of its properties, in accordance with the provisions of Section 113(b) (3) of the 1939 Code.

On March 13, 1959, the Commissioner assessed a deficiency for 1951 in the amount of $39,427.87 plus interest, asserting that only the sum of $20,062.93 (the difference between the face value of the bonds in dollars in 1951 and the cost of acquisition) was excludable from gross income as gain attributable to the discharge of indebtedness, under Section 22(b) (9), and that the balance of the gain attributable to the difference in value of the pound at the time the 438 bonds were issued and the value of the pound at the time the bonds were reacquired, or $85,560.49, was includable in plaintiff's gross income for 1951 as being derived from speculation in foreign exchange.

Plaintiff-taxpayer paid the assessed deficiency, filed a claim for refund which was rejected, and this suit for refund followed. The District Court held that the entire profit realized by the taxpayer in reacquiring the 438 bonds was attributable to the discharge of its own indebtedness, within the meaning of Section 22(b) (9) of the 1939 Code, and, consequently, was excludable from income. From that decision the Government has appealed to this Court.

The taxpayer concedes that it realized a gain or profit on the transactions in question, including that portion attributable to the devaluation of the British pound, which constituted income under Section 22(a) of the 1939 Code, but contends that the devaluation of the pound and the then existing depressed market for the bonds were simply conditions which made the gain possible when it reacquired its bonds in 1951, all of which gain was attributable to (i. e., caused

by) the discharge of its own indebtedness and was, therefore, excludable from its 1951 taxable income under the provisions of Sections 22(b) (9) and 113(b) (3), which the taxpayer invoked by filing the appropriate Form 982 with its tax return. Taypayer also contends that no gain was realized until the bonds were actually purchased.

The Government contends that the transaction contained two elements (1) a discharge of the indebtedness, and (2) a dealing in foreign exchange, and argues that the taxpayer engaged in a speculative activity to take advantage of the devaluation of the pound sterling and thus better its financial condition as indicated by discussions at taxpayer's Board of Directors' meetings commencing shortly after the pound devaluation and also by the fact that taxpayer borrowed money in order to reacquire its bonds. The Government further argues that where a transaction contains two such elements, viz. (1) an ordinary business transaction, and (2) a dealing in foreign exchange, the latter is to be treated separately for tax purposes, and cites certain cases in support of such contention.

■ First of all, it should be noted that Sections 22(b) (9) and 113(b) (3) do not exempt from taxation a gain realized by the taxpayer attributable to the discharge of its indebtedness, but simply provide a means whereby the taxpayer may elect to defer the gain by applying it to the reduction of the basis of any property held by it during the taxable year in which such discharge of said indebtedness occurred, as did the taxpayer in the instant case. Commissioner of Internal Revenue v. Jacobson, 336 U.S. 28, 69 S.Ct. 358, 93 L.Ed. 477; Bangor & Aroostook R. Co. v. Commissioner of Internal Revenue (C.A.1, 1951), 193 F.2d 827. As stated in the taxpayer's brief, these sections "simply permit the postponing of a realized gain to a later date on condition that the basis of the taxpayer's property will be reduced and that any tax on realized gain will be deferred and collected through lower depreciation of the property or a greater

profit in the event of subsequent disposition thereof."

The precise issue in this case is whether that portion of the taxpayer's gain arising from the devaluation of foreign currency is to be attributed to the discharge of its indebtedness within the meaning of Section 22(b) (9) of the 1939 Code.

The applicable provisions of the Internal Revenue Code of 1939, in pertinent part, are as follows:

Section 22(a) defined gross income as:
" 'Gross income' includes gains, profits, and income derived from * * * dealings in property, whether real or personal, growing out of the ownership or use of or interest in such property; also from interest, rent, dividends, securities, or the transaction of any business carried on for gain or profit, or gains or profits and income derived from any source whatever."

Section 22(b) set forth items to be excluded from gross income and exempt from taxation as such, including subparagraph (9) thereof, as follows:

*"Income from discharge of indebtedness.* In the case of a corporation, the amount of any income of the taxpayer attributable to the discharge, within the taxable year, of any indebtedness of the taxpayer or for which the taxpayer is liable evidenced by a security (as hereinafter in this paragraph defined) if the taxpayer, at such time and in such manner as the Secretary by regulations prescribes, makes and files its consent to the regulations prescribed under section 113(b) (3) then in effect. * * * As used in this paragraph the term 'security' means any bond, debenture, note, or certificate, or other evidence of indebtedness, issued by any corporation."

(26 U.S.C. 1952 Ed., Sec. 22.)

Section 113(b) (3), insofar as pertinent, provided:

*"Discharge of indebtedness.* Where in the case of a corporation any

amount is excluded from gross income under section 22(b) (9) on account of the discharge of indebtedness the whole or a part of the amount so excluded from gross income shall be applied in reduction of the basis of any property held (whether before or after the time of the discharge) by the taxpayer during any portion of the taxable year in which such discharge occurred."

There appears to be no case dealing with the application of Section 22(b) (9) to a situation similar to that here involved. None of the cases relied on by the Government involve a claim to exclude income under Section 22(b) (9) or similar provision constituting a gain attributable to the discharge of indebtedness where foreign exchange was involved. Willard Helburn, Inc. v. Commissioner of Internal Revenue, 1 Cir., 214 F.2d 815, merely held that the taxpayer, in repaying a loan in pounds sterling used to purchase foreign goods, realized taxable income because of the devaluation of the pound. In Church's English Shoes, Ltd. v. Commissioner of Internal Revenue (C.A.2), 229 F.2d 957, affirming, per curiam, 24 T.C. 56, the issue was whether a gain resulting from the payment of a debt in pounds after the devaluation of the pound was taxable. America-Southeast Asia Co. v. Commissioner, 26 T.C. 198, and Bennett's Travel Bureau, Inc. v. Commissioner, 29 T.C. 350, are to the same effect, except in the latter case, the Norwegian kroner rather than the British pound was involved. Wool Distributing Corp. v. Commissioner, 34 T.C. 323, involved the problem of whether net losses sustained by a petitioner as a result of dealings in pound sterling and French franc futures are ordinary losses deductible in full from gross income or capital losses allowable only to the extent of offsetting capital gains. In Joyce-Koebel Co. v. Commissioner, 6 B.T.A. 403, merchandise was purchased abroad in pounds sterling on credit and paid for at a time when the rate of exchange was different from that prevailing at the date of purchase. The

problem was whether a loss or gain could be said to have taken place and how to measure it. In Bernuth Lembcke Co. v. Commissioner, 1 B.T.A. 1051, the question was whether the taxpayer had a deductible loss during the taxable year in respect to the purchase and disposition of pounds sterling at a contract price, when the price of sterling at the actual date of purchase was less than at the date of the contract

Generally, these cases involved purchases of goods with foreign currency on credit and a subsequent profit or loss realized through discharge of the indebtedness with foreign currency after devaluation or fluctuation in the rate of exchange. None of such cases presented the issue of whether a taxpayer might avail itself of the relief provisions of the Internal Revenue Code which are involved in the instant case. Assuming there was a dealing in foreign exchange in connection with taxpayer's acquisition of its 438 bonds as claimed by the Government, clearly there could be no gain realized therefrom, except for the discharge of the indebtedness incurred.

The Government also argues that the special relief treatment contemplated by Section 22(b) (9) should not include any amount which "had evaporated through devaluation and was not in existence at the time of the discharge" of the indebtedness, that in the taxable year 1951 the taxpayer "actually owed only $280 for each bond" and, hence, "the income attributable to the discharge of the indebtedness within the language of Code Section 22(b) (9) was the difference between $280 and the actual cost of acquiring each bond." Such a theory suggests that as the pound decreased in value, the debt likewise decreased in amount. This reasoning would lead to the absurd result that when the taxpayer purchased the bonds in question, it realized no gain. Such a view is obviously unsound and must be rejected. The taxpayer correctly argues that if the debt could be adjusted from day to day in accordance with the fluctuating rate of exchange, there could never be a realized profit.

524

The taxpayer admittedly made a profit on these transactions. The entire profit was caused by the taxpayer's discharging its indebtedness when a favorable currency situation existed, or, to put it another way, District Judge Shelbourne aptly stated—"It is obvious that had the K & I not purchased its bonds at the depressed value no profit would have been realized."

In United States v. Kirby Lumber Co. (1931), 284 U.S. 1, 52 S.Ct. 4, 76 L.Ed. 131, the Supreme Court held that the taxpayer realized taxable income when it purchased some of its outstanding bonds at a price less than the issuing price. In such a situation, the taxpayer would derive no funds with which to pay the tax, as distinguished from an ordinary business transaction where goods are sold at a profit, making funds available for payment of the tax created thereby. In Bangor & Aroostook R. Co. v. Commissioner of Internal Revenue, 1 Cir., supra (1951), 193 F.2d 827, a case involving the application of Sections 22(b) (9) and 113(b) (3), the Court in commenting on the decision in the Kirby Lumber case and the subsequent enactment of the said statutes as relief measures stated (193 F.2d p. 831):

"The rule in United States v. Kirby Lumber Co., 1931, 284 U.S. 1, 52 S.Ct. 4, 76 L.Ed. 131, has been criticized both on theoretical and practical grounds, and doubtless in many cases it worked a hardship. Congress took account of these criticisms in 1939, when it amended the Internal Revenue Code by adding a new paragraph (9) to § 22(b), and a corresponding new paragraph (3) to § 113(b)."

To require the taxpayer in the instant case to include any part of the gain realized from the purchase of its outstanding bonds here involved as taxable income for the year when such bonds were acquired, would defeat the underlying purpose of Section 22(b) (9). Neither the language of this statute nor its legislative history indicate a Congressional intent to exclude from the benefits of the statute any of the income attributable to the discharge of taxpayer's indebtedness, for any reason whatsoever.

The judgment of the District Court is affirmed.