*Decisions will be entered under Rule 155.*

PHILIP MORRIS INCORPORATED, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 28279–92.        Filed January 23, 1995.

*Jerome B. Libin, William S. Corey,* and *David A. Golden,* for petitioner.

*Lewis R. Mandel,* for respondent.

OPINION

TANNENWALD, *Judge:* Respondent determined deficiencies in petitioner's Federal income taxes for the 1982, 1983, and 1984 taxable years in the amounts of $4,594,256, $11,217,945, and $6,111,795, respectively. The parties have settled all but one issue involving the proper treatment of gains resulting from the use of foreign currency, the value of which changed in relation to the U.S. dollar between the dates of borrowings and repayments in the same currency.

All the facts have been stipulated and are so found. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference.

Petitioner is a corporation organized and existing under the laws of the Commonwealth of Virginia with its principal office in New York, New York. During the taxable years in issue, petitioner was the common parent of a group of affiliated corporations. At all relevant times, petitioner used the accrual method of accounting and filed consolidated Federal income tax returns for the taxable years before us with the Internal Revenue Service, Holtsville, New York.

Petitioner engaged in the following six transactions:

(1) On November 24, 1980, petitioner borrowed 100 million Swiss francs (SF) from Union Bank of Switzerland (UBS). The loan bore interest at 6½ percent per annum and was repayable on December 1, 1987. The proceeds were converted into U.S. dollars on the date of borrowing, at the rate of US$1 equals SF1.72038, for a total of $58,126,692.94. On September 1, 1983, petitioner prepaid the principal plus accrued interest, without incurring a prepayment penalty. On that date, the spot rate was US$1 equals SF2.1875 so that the U.S. dollar value of the principal payment was $45,714,286. The source of the SF100 million prepayment was: (a) SF85,229,861 acquired by petitioner on May 31, 1983, and placed on deposit with UBS until the date of prepayment, which amount was part of the proceeds of six forward contracts purchased by petitioner on May 10, 1983, at a weighted average rate of exchange of US$1 equals

SF2.03045218; (b) accrued interest income of SF981,250 on said deposit, converted at an exchange rate of US$1 equals SF2.1433; and (c) SF13,788,889 acquired by petitioner on September 1, 1983, which amount was part of the proceeds of a forward contract purchased by petitioner on August 18, 1983, at an exchange rate of US$1 equals SF2.1433.

(2) On December 22, 1980, petitioner borrowed SF125 million from UBS. The loan bore interest at 7 percent per annum and was repayable on December 31, 1985. The proceeds were converted on the date of borrowing at the rate of US$1 equals SF1.81308, for a total of $68,943,455.34. On May 31, 1983, petitioner prepaid to UBS the principal and accrued interest plus a prepayment penalty. On that date the spot rate was US$1 equals SF2.1005, so that the U.S. dollar value of the principal payment was $59,509,641. The SF125 million was acquired on May 31, 1983, as part of the proceeds of the SF280.6 million in aggregate forward contracts purchased by petitioner on May 10, 1983, at a weighted average exchange rate of US$1 equals SF2.03045218.

(3) On December 23, 1980, petitioner borrowed SF75 million from Swiss Bank Corp. (SBC). The loan bore interest at 7 percent per annum and was repayable on December 23, 1985. The proceeds were converted on the date of borrowing at the rate of US$1 equals SF1.81310, for a total of $41,365,586.86. On January 7, 1983, petitioner prepaid the SF75 million principal. On that date, the spot rate was US$1 equals SF1.9340. The source of the SF75 million was a SF100 million private placement issue by petitioner on December 22, 1982, when the spot rate was US$1 equals SF2.0150, so that the U.S. dollar value of the repayment was $37,220,844.

(4) On January 13, 1982, petitioner financed, in pounds sterling, 80 percent of the contract value of certain rotary tobacco-cutting machines purchased by petitioner, with the financed amount (including a 2.6-percent finance charge equivalent) to be repaid in 10 equal semiannual installments with interest at 8.5 percent per annum on the unpaid balance. The pound sterling/dollar exchange rate of the 80 percent of the contract value plus the finance charge equivalent was US$1,282,959 and of two semiannual installments was US$256,592. In 1983, two semiannual installments were paid in pounds sterling having U.S. dollar value of $215,633 based

on the exchange rate on the dates of payment. In 1984, two semiannual installments were paid in pounds sterling, the U.S. dollar value of such repayment being US$188,410.

(5) On September 28, 1982, petitioner financed, in pounds sterling, 80 percent of the contract value of certain cigarette manufacturing machinery to be purchased by petitioner, with the financed amount (including a 2.6-percent finance charge equivalent) to be repaid in 10 equal semiannual installments and interest at 11 percent per annum on the unpaid balance. The contemporaneous pound sterling/dollar exchange rate of the 80 percent of the contract value plus the finance charge equivalent was US$10,633,669, and one semiannual install-ment was equivalent to US$1,063,367, and of two semi-annual installments was equivalent to US$2,126,734. In 1983, petitioner made one semiannual installment payment in pounds sterling having a U.S. dollar value of $981,144, based on the exchange rate on the date of payment. In 1984, petitioner made two semiannual installment payments in pounds sterling having a total U.S. dollar value of $1,759,735 based on the exchange rate on the dates of payment.

(6) On February 10, 1982, a wholly owned subsidiary of petitioner sold to a German bank, for ultimate sale to the public, 150 million German marks (DM) of $9\frac{1}{2}$-percent, 7-year bearer bonds, which were guaranteed by petitioner. The net proceeds of the bearer bond issue amounted to DM147,888,333.33 after underwriting and other expenses. The net proceeds were transferred from the subsidiary to petitioner on a discount basis at a $10\frac{1}{2}$-percent interest rate on February 16, 1982. Petitioner received DM147,888,333.33 and was obligated to repay DM150 million. The net proceeds of DM147,888,333.33 were converted by petitioner into US$62,581,611.08 on February 16, 1982, at an exchange rate of US$1 equals DM2.36313. From March 12 through May 3, 1984, the subsidiary purchased in the market bearer bonds with an aggregate par value of DM10 million, at an aggre-gate purchase price of DM10,924,824.92 plus accrued interest. A portion of the funds for the repurchase of bonds was supplied by petitioner through a series of prepayments by it aggregating DM10 million of its intercompany indebted-ness to the subsidiary, plus accrued interest. At the exchange rates on the dates of prepayments, the cost of DM10 million was US$3,769,505.

In each transaction, the value of the foreign currency had decreased in value relative to the U.S. dollar between the date the borrowings were incurred and the date of repayment, so that fewer dollars were necessary to acquire the foreign currency for repayment than the U.S. dollar value of the borrowings at the time they were created.

In its consolidated returns for 1983 and 1984, petitioner treated its gain from the aforesaid use of foreign currency (hereinafter referred to as exchange gain), representing the difference between the U.S. dollar value of the foreign currency on the date of borrowing and the dollar cost of the currency used for repayment, as income from the discharge of indebtedness under section 108[1] and reduced its basis under section 1017 by the same amount.

In the notice of deficiency, respondent disallowed petitioner's elections under section 108 and treated the amounts of gain reported by petitioner as section 61 ordinary income and not income from discharge of indebtedness eligible for such election.

Section 108 provides in pertinent part:

SEC. 108(a). EXCLUSION FROM GROSS INCOME.—

    (1) IN GENERAL.—Gross income does not include any amount which (but for this subsection) would be includible in gross income by reason of the discharge (in whole or in part) of indebtedness of the taxpayer if—

                \*     \*     \*     \*     \*     \*     \*

    (C) the indebtedness discharged is qualified business indebtedness.

"[I]ndebtedness of the taxpayer" means any indebtedness for which the taxpayer is liable or subject to which the taxpayer holds property. Sec. 108(d)(1). Indebtedness is treated as "qualified business indebtedness" where it is incurred or assumed by a corporation which elects to treat it as such indebtedness. Sec. 108(d)(4).[2] The amount excluded as qualified business indebtedness "shall be applied to reduce the basis of the depreciable property of the taxpayer", as provided by section 1017. Sec. 108(c)(1). Thus, section 108 does not exempt income from taxation, but defers the payment of tax.

---

[1] Unless otherwise indicated, all statutory references are to the Internal Revenue Code in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2] Respondent does not dispute that petitioner made a timely and proper form of election.

Petitioner initially argues that: (1) For purposes of determining their U.S. tax consequences, the borrowings must be accounted for as if they were U.S. dollar borrowings; (2) it satisfied its indebtedness for fewer dollars than it originally borrowed; and (3) in this context, the classic test of income from the discharge of indebtedness has been satisfied, and consequently such income is eligible for exclusion from gross income under section 108 and reduction of basis under section 1017. Petitioner further asserts that its exchange gain should be recomputed so as to represent the difference between the U.S. dollar value of the foreign currency on the date of the borrowings and the U.S. dollar value of that currency on the date of repayment. Petitioner also suggests, without explanation or argument, that it is entitled to recognize gain or loss on the difference between the U.S. dollar value of the foreign currency used to repay the borrowings at the date that currency was acquired and such value at the time of repayment.

Respondent argues that, because the foreign currency obligations were paid in full in the same currency, there was no "discharge of indebtedness" within the meaning of section 108 and therefore petitioner is not entitled to exclude the exchange gain from income under that section. Respondent further contends that, in any event, the exchange gain was not income from discharge of indebtedness within the meaning of section 61(a)(12), and that we should overrule our decision in *National-Standard Co. v. Commissioner,* 80 T.C. 551 (1983), affd. 749 F.2d 369 (6th Cir. 1984), and hold that the exchange gain constituted short-term capital gain measured by the difference between the U.S. dollar value of the foreign currency on the date the indebtedness was incurred and the U.S. dollar value of the foreign currency used in repayment on the date it was acquired (not the date of repayment) and based upon a holding period measured from the date the foreign currency used for repayment was acquired and the date of repayment. Respondent does not address the question of how we should treat the difference between the U.S. dollar value on the date of acquisition of the foreign currency and such value on the date of repayment.

Initially, we note that neither party disputes the proposition that exchange gain arises as a result of a transaction separate from the underlying transaction in respect of which

the foreign currency or its proceeds in U.S. dollars were used, e.g., to acquire property. See, e.g., *Church's English Shoes, Ltd. v. Commissioner,* 229 F.2d 957 (2d Cir. 1956), affg. per curiam 24 T.C. 56 (1955); *FNMA v. Commissioner,* 100 T.C. 541, 583 (1993); *Levin v. Commissioner,* 87 T.C. 698, 729 n.19 (1986), affd. 832 F.2d 403 (7th Cir. 1987); *National-Standard Co. v. Commissioner,* 80 T.C. at 555; *Willard Helburn, Inc. v. Commissioner,* 20 T.C. 740 (1953), affd. 214 F.2d 815 (1st Cir. 1954); H. Conf. Rept. 99–841 (Vol. II), 1986–3 C.B. (Vol. 4) 1, 662.[3] Nor do the parties disagree that foreign currency in the hands of a U.S. taxpayer is considered property. *FNMA v. Commissioner,* 100 T.C. at 582.

We deal first with petitioner's assertion that we should treat the transactions involved herein as borrowings and repayments in U.S. dollars. Admittedly, there is language in the decided cases which lends support to this position. Thus, in *America-Southeast Asia Co. v. Commissioner,* 26 T.C. 198 (1956), the taxpayer borrowed pounds sterling to purchase burlap, of which it was a dealer, and realized exchange gain on the repayment of its obligation with the same amount of pounds sterling. In the course of deciding that the gain should be treated as ordinary income from the taxpayer's business of dealing in burlap and not as capital gain arising from speculation in foreign exchange separate from that business, we stated at 200:

> The end result of petitioner's purchase of burlap with borrowed pounds sterling was that it was able to purchase burlap worth $96,013.33 and subsequently settle the debt which it owed for $66,603.32. We are satisfied that the resulting gain, while measured by the difference in the value of pounds sterling at the time they were borrowed and the value when they were repaid, is a gain arising directly out of petitioner's trade or business from the settlement of a debt incurred therein *for less than its face amount.* * * * [Emphasis added.]

We think our translation of the transaction into dollars was for the limited purpose of deciding the issue of capital gain

---

[3] Under *Bowers v. Kerbaugh Empire Co.,* 271 U.S. 170 (1926), it was once uncertain whether borrowing, such as is involved herein, produced taxable gain, see, e.g., *B.F. Goodrich Co. v. Commissioner,* 1 T.C. 1098 (1943); *Coverdale v. Commissioner,* a Memorandum Opinion of this Court dated June 28, 1945, but that line of cases now holds little validity, *Vukasovich, Inc. v. Commissioner,* 790 F.2d 1409 (9th Cir. 1986), affg. in part and revg. in part T.C. Memo. 1984–611; *National-Standard Co. v. Commissioner,* 80 T.C. 551, 568–569 (Tannenwald, J., dissenting) (1983), affd. 749 F.2d 369 (6th Cir. 1984); *Willard Helburn, Inc. v. Commissioner,* 20 T.C. 740 (1953), affd. 214 F.2d 815 (1st Cir. 1954); Ravenscroft, Taxation and Foreign Currency 214 (1973).

versus ordinary income from a trade or business. In this connection, we note that there is no reference in our opinion to the question whether the ordinary income constituted income from the discharge of indebtedness that could be excluded from gross income under the then-applicable sections 22(b)(9) and 113 (b)(3) of the Internal Revenue Code of 1939 (the predecessors of sections 108 and 1017, involved herein). Similar reasoning disposes of Rev. Rul. 74–122, 1974–1 C.B. 21, and Rev. Rul. 78–281, 1978–2 C.B. 204, cited by petitioner, which dealt with the measurement of foreign currency income received for the performance of services and the purchase price of property acquired with foreign currency.

In *Gillin v. United States,* 191 Ct. Cl. 172, 423 F.2d 309 (1970), the taxpayer borrowed Canadian dollars which he immediately converted into U.S. dollars for the payment of personal expenses and investments. He repaid these borrowings in the same amount of Canadian dollars which he had purchased with U.S. dollars at the time of repayment. In the interval between the borrowing and the repayment, the Canadian dollar had depreciated in value vis-a-vis the U.S. dollar. The Court of Claims held that the gain should be treated as income from the discharge of indebtedness under section 61(a)(12) and not as capital gain. In so holding, the Court of Claims stated at 423 F.2d 313: "In effect, the taxpayer borrowed United States funds, and the source of his gain was a decline in the value of the debt in terms of American dollars, enabling him to retire it for less United States currency than he received in incurring it." Here again, the issue involved the characterization of the exchange gain between two types of income for purposes of inclusion in gross income; the issue of excludability under section 108 was not involved, presumably because the borrowings did not meet the requirement of qualified business indebtedness. Moreover, we note that the Court of Claims did not say there *was* borrowing and repayment in U.S. dollars but merely stated that this is *in effect* what happened. Our view that this difference in expression should be accorded significant impact is reinforced by the fact that the court's immediately preceding sentence referred to the proximity of the conversions to the loan and repayment as making "clear that plaintiff's intent in borrowing the Canadian dollars was to acquire

United States money at once and that currency, in turn, was to be used later to buy back Canadian Funds to repay the debt, if possible at an exchange profit." *Id.* Thus, we are satisfied that the language of the Court of Claims does not inhibit our analysis of the issue of the exclusion from gross income under section 108.

Finally, we address *National-Standard Co. v. Commissioner,* 80 T.C. 551 (1983). In that case, the taxpayer borrowed Luxembourg francs to acquire a 50-percent stock interest in a Luxembourg corporation. Later, the taxpayer refinanced the loan with Belgian francs, which had the same dollar value as Luxembourg francs. After selling the stock in the Luxembourg corporation, the taxpayer purchased sufficient Belgian francs, with U.S. dollars, to repay the debt. At each step, the value of the U.S. dollar had decreased compared to both the Luxembourg and Belgian francs. In holding there was no sale or exchange of foreign currency, we stated:

Likewise, when petitioner purchased francs to repay the Societe Generale loan, the purchased francs were transferred the same day to Societe Generale in satisfaction of the debt. Consequently, under the rationale of *Kenan v. Commissioner* [, 114 F.2d 217 (2d Cir. 1940),] no loss was realized.[12]

And yet, petitioner certainly realized an economic loss upon the repayment of each of the loans herein as a result of the currency fluctuations, which loss is recognized for tax purposes. This [exchange] loss * * * was due to the fact that the amount of the debt itself had increased, in terms of U.S. dollars.

*In short, the losses incurred herein were the result of the repayment of an indebtedness with more U.S. dollars than were originally borrowed.*[13]
* * *

---

[12] * * * However, the amount petitioner "realized" was not the U.S. dollar value of francs when borrowed. Rather, it was the extinguishment of a debt at a time that debt had a U.S. dollar value equal to the cost of the francs used to pay off such debt.

[13] *This is not to say that the amount repaid was in fact more than the face amount of the debt. To the contrary, exactly what was owed, was paid,* to wit, BF250 million. Rather the U.S. dollar cost of repaying that loan had increased.

[*National-Standard Co. v. Commissioner,* 80 T.C. at 563–564; emphasis added.]

We think petitioner's reliance on the first italicized language is misplaced particularly since, although it quotes the second italicized language constituting footnote 13, it fails to

discuss the impact of footnote 13. Clearly, we were attempting to reconcile the fact that there was no loss realized upon the actual satisfaction of the debt with the fact that there was an economic loss from the combined transactions. Discussion of paying the debt with more U.S. dollars was used merely to explain there was an economic loss, despite paying back the face value of the debt. Footnote 13 specifically explains that, despite exchange loss, the face amount of the debt was paid, thus indicating that our discussion of U.S. dollars should not be interpreted as applying in a different context such as is involved herein.

In view of the foregoing, we are not disposed to deem the borrowings and repayments herein as representing only U.S. dollar transactions and ignore the fact that they were undertaken and implemented in accordance with their terms; i.e., in foreign currencies. See Miller, "Foreign Currency Transactions: A Review of Some Recent Developments", 33 Tax Law. 825, 838 (1980). But see Newman, "Tax Consequences of Foreign Currency Transactions: A Look at Current Law and an Analysis of the Treasury Department Discussion Draft", 36 Tax Law. 223, 232 (1983).

In the final analysis, our disposition of the issue before us turns upon whether we should apply *Kentucky & Ind. Terminal R.R. v. United States,* 330 F.2d 520 (6th Cir. 1964) (*Kentucky & Indiana*), as petitioner contends, or *United States v. Centennial Sav. Bank FSB,* 499 U.S. 573 (1991) (*Centennial Savings*), as respondent contends.

In *Kentucky & Indiana,* the taxpayer, in 1911, issued bonds in pounds sterling. In 1951, it purchased 438 of these bonds in the open market, paying for most of them in U.S. dollars and the remainder in pounds sterling. The excess of the face value of the bonds over the purchase price consisted of two elements: (1) The discount between the face value of the bonds in U.S. dollars and the acquisition price, and (2) the difference between the 1911 and 1951 values of the pounds sterling. The taxpayer elected to exclude such excess from gross income and reduce its basis in its assets under sections 22(b)(9) and 113(b)(3) of the Internal Revenue Code of 1939 (the predecessors of sections 108 and 1017). Respondent allowed the election to the extent of the first element of the excess but disallowed the amount represented by the second element. The Court of Appeals for the Sixth Circuit held

for the taxpayer on the ground that the exchange gain represented by the second element would not have been realized "except for the discharge of the indebtedness incurred". 330 F.2d at 523. It reasoned that the taxpayer "would derive no funds with which to pay the tax" on such gain and went on to state:

> To require the taxpayer in the instant case to include any part of the gain realized from the purchase of its outstanding bonds here involved as taxable income for the year when such bonds were acquired, would defeat the underlying purpose of Section 22(b)(9). Neither the language of this statute nor its legislative history indicate a Congressional intent to exclude from the benefits of the statute any of the income attributable to the discharge of taxpayer's indebtedness, for any reason whatsoever. [330 F.2d at 524.]

In *United States v. Centennial Sav. Bank FSB, supra,* the issue was whether a penalty for early withdrawal of time deposits, in accordance with restrictions in the agreements governing the deposits, constituted income from the discharge of indebtedness eligible for exclusion and reduction in basis under sections 108 and 1017. The Supreme Court held that it was not so eligible on the ground that the withdrawal, consisting of the face amount of the deposit less the penalty for early withdrawal, was in accordance with the terms of the deposit, i.e., at the agreed face value under such circumstances. Petitioner argues that *Centennial Savings* did not involve foreign currency transactions, that the Supreme Court made no reference to *Kentucky & Ind. Terminal R.R. v. United States, supra,* or any other cases involving foreign currency transactions, and that it held only that a payment of a dollar indebtedness at less than its original amount in accordance with terms of repayment (a situation that did not exist in *Kentucky & Indiana*) does not give rise to income from the discharge of indebtedness within the meaning of section 108. Consequently, petitioner asserts that *Kentucky & Indiana* retains its vitality and controls our decision herein.

Petitioner unduly narrows the scope of *Centennial Savings* when it seeks to confine its impact to situations where the amount of the repayment of an indebtedness at less than its face value is "determinable under the express terms of the original borrowing documentation." The Supreme Court's articulation of the scope of section 108 goes beyond the fac-

tual context of that case. We think that the articulation rests upon a broad fundamental premise, namely:

As used in §108, the term "discharge * * * of indebtedness" conveys *forgiveness of,* or *release from* an obligation to repay.[6]

---

[6] "Discharge" can be used to signify various means of extinguishing a legal duty. See generally Black's Law Dictionary 463 (6th ed. 1990). Thus, a debtor might be said to "discharge" his debt by satisfying it. But §108 uses "income by reason of the discharge * * * of indebtedness" to refer to the change in the debtor's financial condition when the debtor is no longer legally required to satisfy his debt either in part or in full. "Discharge" in this sense can occur only if the creditor cancels or forgives a repayment obligation.

[*United States v. Centennial Savings Bank FSB,* 499 U.S. at 580–581.]

In footnote 7, it concludes that "Centennial's reliance on §108 fails for a * * * fundamental reason—the absence of a 'discharge' for purposes of the statute". *Id.* at 582 n.7.

Granted that *Centennial Savings* did not expressly overrule *Kentucky & Indiana,* it cannot be gainsaid that the rationale of the Supreme Court is inconsistent with that of the Court of Appeals for the Sixth Circuit. We are satisfied that, at least as far as this case is concerned, *Kentucky & Indiana* has been sapped of its vitality. See *Vukasovich, Inc. v. Commissioner,* 790 F.2d 1409, 1416 (9th Cir. 1986), affg. in part and revg. in part T.C. Memo. 1984–611 (where the impact of a Supreme Court opinion is not clearly discernible, it is up to the lower court to decide the case before it according to its reasoned "view of the way the Supreme Court would decide the pending case today"); see also *Hicks v. Commissioner,* 47 T.C. 71, 74 (1966).[4] In the same vein, we are satisfied that, if our analysis of the language of *America-Southeast Asia Co. v. Commissioner,* 26 T.C. 198 (1956); *Gillin v. United States,* 191 Ct. Cl. 172, 423 F.2d 309 (1970); and *National-Standard Co. v. Commissioner,* 80 T.C. 551 (1983), is incorrect, *Centennial Savings* deprives petitioner of any support therefrom. Moreover, the Supreme Court concluded "that Congress did not intend to extend the benefits of §108 beyond the setting in which a creditor agrees to

---

[4] We note that, in any event, we would not necessarily be bound by *Kentucky & Ind. Terminal R.R. v. United States,* 330 F.2d 520 (6th Cir. 1964), since an appeal in this case would not lie to the Court of Appeals for the Sixth Circuit. *Golsen v. Commissioner,* 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971).

release a debtor from an obligation assumed at the outset of the relationship." *United States v. Centennial Sav. Bank FSB,* 499 U.S. at 584. This statement directly conflicts with that of the Court of Appeals for the Sixth Circuit in *Kentucky & Ind. Terminal R.R. v. United States, supra,* as to legislative intention (see *supra* p. 71).

We think the teaching of *Centennial Savings* is clear, namely that the discharge of an indebtedness may be the occasion for the realization of income but, unless there is a cancellation or forgiveness of a portion of the indebtedness not reflected in the terms of the indebtedness, such income is not realized *"by reason of the discharge * * * of indebtedness of the taxpayer"* (emphasis added) as required by section 108(a). See Ravenscroft, Taxation and Foreign Currency 215–216 (1973).

The conclusion that the *occasion* may differ from the *reason* for realization finds support in the fact that petitioner would have had no taxable gain absent its conversion of the proceeds of the borrowings to, and the obtaining of the means of repayment from, U.S. dollars. If the foreign currency had not been exchanged, and instead held in its borrowed form, petitioner would have had a loss (albeit unrealized) on the value of its currency in hand exactly offsetting the economic gain (albeit unrealized) from repayment in a devalued currency, and thus no gain or loss for tax purposes. *Willard Helburn, Inc. v. Commissioner,* 20 T.C. 740, 743 (1953), affd. 214 F.2d 815 (1st Cir. 1954); see *National-Standard Co. v. Commissioner,* 80 T.C. at 569 n.4 (Tannenwald, J., dissenting) ("the value at the time of borrowing and the cost of acquisition would be the same"). Petitioner has taxable gain on the *occasion* of the discharge of its indebtedness but only because it exchanged the foreign currency for U.S. dollars (the *reason*).

Our interpretation of section 108 finds support in the legislative history of section 22(b)(9) of the Internal Revenue Code of 1939 (the predecessor of section 108). At the time of its initial enactment, in the Revenue Act of 1939, ch. 247, sec. 215, 53 Stat. 862, 875, the report of the House Ways and Means Committee made clear that the purpose of the section was to provide relief to a corporate taxpayer which acquired its evidences of indebtedness "at less than their face value". H. Rept. 855, 76th Cong., 1st Sess. 7 (1939), 1939–2 C.B. 504,

507; see *Colonial Sav. Association v. Commissioner,* 854 F.2d 1001, 1005 (7th Cir. 1988), affg. 85 T.C. 855 (1985) and 87 T.C. 665 (1986); see also S. Rept. 1631, 77th Cong., 2d Sess. 77 (1942), 1942–2 C.B. 504, 564, referring to the repurchase of a corporation's "own bonds at a discount"; Report of the Staff of the Joint Committee on Internal Revenue Taxation 23 (1951), referring to a corporation which "buys back its own bonds at less than their face value". We are unimpressed with petitioner's effort to find sustenance in the fact that, in enacting section 988,[5] the legislative history indicates that section 988 "reverses the result in the *Kentucky & Indiana Terminal Railroad* case" and that business taxpayers "rely on this decision". S. Rept. 99–313 (1986), 1986–3 C.B. (Vol. 3) 1, 435, 461; Staff of Joint Comm. on Taxation, General Explanation of the Tax Reform Act of 1986, at 1, 1070, 1098 (J. Comm. Print 1987). Leaving aside the impact of the later opinion of the Supreme Court in *United States v. Centennial Sav. Bank FSB, supra,* on the 1986 legislative history, we think petitioner gives it too broad a reading. There is nothing in that history to indicate that Congress was approving public understanding or the judicial resolution of the issue before us; Congress only said that it was establishing a new set of rules, irrespective of the correctness of preexisting case law.

In sum, we hold that petitioner's exchange gain was not "includible in gross income by reason of the discharge" of its indebtedness within the meaning of section 108, and therefore petitioner is not entitled to elect to exclude such income under section 108 and reduce the basis in its assets under section 1017. Under the circumstances of this case, where, as far as we can determine, the amount to be included does not depend upon its characterization as ordinary income or short-term capital gain, we have no need to address respondent's argument in this respect. Discussion of respondent's argument would require us to revisit *National-Standard Co. v. Commissioner, supra,* a path which we are not inclined to travel under the circumstances herein. In this connection, we note that it does not necessarily follow, as respondent

---

[5] For tax years beginning after Dec. 31, 1986, foreign currency borrowings, such as are involved herein, are subject to sec. 988. The borrowings are considered "section 988 [transactions]", sec. 988(c)(1)(A)(i) and (B)(i), and the foreign currency gain is treated as ordinary income, sec. 988(a).

appears to assert, that a holding that income does not arise "*by reason of* the discharge \* \* \* of indebtedness" (emphasis added) requires the conclusion that it is not "income from discharge of indebtedness" under section 61(a)(12). Similarly, we find it unnecessary to consider petitioner's suggestion, see *supra* pp. 65–66, that we break the exchange gain into two parts.[6]

In order to reflect our holding herein and the disposition of the settled issues,

*Decision will be entered under Rule 155.*

_____

[6] If we are in error as to the lack of necessity to deal with these arguments, they can be dealt with under Rule 155.