FRONTIER SAVINGS ASSOCIATION AND SUBSIDIARIES, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

FRONTIER SAVINGS AND LOAN ASSOCIATION, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 16209-81, 24559-83.     Filed September 24, 1986.

---

*Robert A. Schnur*, for the petitioner.
*Mark D. Petersen*, for the respondent.

SWIFT, *Judge*: In statutory notices of deficiency dated June 3, 1981, and August 12, 1983, respondent determined deficiencies in petitioner's Federal income tax liabilities as follows:

| Years | Deficiencies |
| --- | --- |
| 1977 | $1,628.15 |
| 1978 | 19,376.14 |
| 1979 | 17,887.00 |

These cases have been consolidated for purposes of trial, briefing, and opinion.

Following concessions, the issue remaining for decision is whether stock dividends received by petitioner in 1978 and 1979 from the Federal Home Loan Bank of Chicago are taxable to petitioner under section 305(b)(1)[1]. The resolution of this issue will affect the taxability of stock dividends received by the other 496 stockholders of the Federal Home Loan Bank of Chicago which also received stock dividends in 1978 and 1979.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

Petitioner Frontier Savings Association (Frontier Savings) is a mutual savings and loan association which was organized on February 19, 1919. It operates as a mutual savings association pursuant to Wisconsin law. The princi-

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as in effect during the years in issue.

pal corporate office of Frontier Savings is located in Green Bay, Wisconsin. Frontier Savings and its subsidiaries timely filed consolidated Federal Corporation Income Tax Returns (Forms 1120) for each of the years 1978 and 1979.

Frontier Savings has been a member and stockholder of the Federal Home Loan Bank of Chicago (the Chicago Bank) at all times since the organization of the Chicago Bank. The Chicago Bank is one of 11 district banks (12 prior to 1946) established pursuant to the Federal Home Loan Bank Act of 1932, 47 Stat. 725, 12 U.S.C. sec. 1421 et seq. The district banks were capitalized with stock subscriptions from member institutions and the U.S. Treasury. District banks operate under the supervision of the Federal Home Loan Bank Board, an administrative agency in the Executive Branch of the Federal Government. The Federal Home Loan Bank Board also is the chartering and regulatory authority for Federal savings and loan associations and Federal mutual savings banks.

The Federal Home Loan Bank system was designed primarily as a reserve credit facility for savings and loan associations and other home mortgage credit institutions. Savings and loan associations (such as Frontier Savings) and mutual savings banks that are members or stockholders in the district banks (hereinafter referred to as members or member banks) are required by Federal law to maintain a certain capital stock ownership in the respective district banks of which they are members. The stock ownership requirements are determined at the end of each calendar year and are calculated with reference to each member bank's net home mortgage loans outstanding and total borrowings of each member from the district bank.

Each member bank generally must maintain a capital stock ownership interest in the district bank in an amount equal to at least 1 percent of the total outstanding balance of its home mortgage loans[2] and at least equal to one-twelfth[3] of total outstanding borrowings of the member bank from the district bank, as of December 31 of each year. Each share of stock in the district banks is valued by

[2]Each bank that became a member before Sept. 8, 1961, is required to maintain a stock ownership interest of 2 percent of its total outstanding balance of home mortgage loans.

[3]This requirement was changed to one-twentieth in 1979. Act of Dec. 21, 1979, sec. 327, Pub. L. 96-153, 93 Stat. 1121.

statute at its $100 par value. See 12 U.S.C. sec. 1426(b) and (c) (1978).

Based upon the above yearend calculations, member banks that are required to purchase additional stock of district banks must do so by January 31 of the following year at the par value of $100 per share. Member banks that own stock in district banks in excess of the required number of shares (excess shares) may request that excess shares be redeemed by the district banks.

The policy of the Chicago Bank with respect to the redemption of excess shares is reflected in the minutes of a June 18, 1979, meeting of the Chicago Bank's board of directors, as follows:

> BE IT RESOLVED, that the President of the Bank or any officer designated by him may from time to time increase or decrease the amount of stock of any member in accordance with Section 6 of the Federal Home Loan Bank Act [i.e., 12 U.S.C. §1426(c)] and the Regulations for the Federal Home Loan Bank System; provided, however, that in exercising the Bank's discretion whether or not to grant an application by a member to decrease its stock, the President or his designee shall be guided by all applicable statutory and regulatory provisions, all policies and standards adopted from time to time by this Board, including, but not limited to, the Bank's credit standards contained in the "Policies Governing Extension of Credit" as adopted by this Board and all relevant facts and circumstances.

As of December 31, 1977, Frontier Savings owned 6,721 shares of stock in the Chicago Bank, all of which it had purchased over many years from the Chicago Bank at $100 per share. On that day, the principal amount of Frontier Savings' outstanding mortgage loans and borrowings from the Chicago Bank was such that, prior to January 31, 1978, Frontier Savings was required to increase its stock interest in the Chicago Bank to 9,066 shares. Accordingly, during January of 1978, Frontier Savings purchased 2,345 additional shares of the common stock of the Chicago Bank for $234,500. Frontier Savings neither purchased nor sold any additional shares of common stock in the Chicago Bank in 1978, so that as of December 28, 1978, Frontier Savings owned 9,066 shares of the common stock of the Chicago Bank.

As stockholders in district banks, member banks are entitled to receive dividends that are declared by district

banks. Prior to December 29, 1978, dividends were paid by the Chicago Bank to its member banks in the form of cash. On December 29, 1978, dividends were paid by the Chicago Bank to its member banks in the form of additional shares of common stock. On December 31, 1979, dividends were paid by the Chicago Bank to its member banks half in stock and half in cash.

### December 29, 1978, Stock Dividend

At a meeting held on November 20, 1978, the board of directors of the Chicago Bank adopted a resolution to pay a 6.58-percent dividend to its stockholders of record as of December 31, 1978. Subject to the approval of the Federal Home Loan Bank Board, the resolution stated that the dividend would be paid in the form of shares of stock in the Chicago Bank. On December 22, 1978, the Director of the Office of District Banks, Federal Home Loan Bank Board, wrote a letter to the President of the Chicago Bank approving the stock dividend.

On December 22, 1978, the Chicago Bank mailed a bulletin to its member banks, informing them that a 6.58-percent stock dividend would be paid, with fractional shares to be paid in cash. The explanation made in the bulletin for paying a stock dividend, rather than a cash dividend, was as follows:

(1) Providing a stock rather than a cash dividend may enable your association to defer the payment of income taxes on the value of the stock dividend. You may wish to consult your tax adviser for the proper handling of a stock dividend.

(2) A stock dividend can be applied toward satisfying the stock investment requirement for members that experienced a growth in assets during 1978 or that will be required to purchase additional stock due to increased borrowings from the Bank.

The bulletin also explained that most member banks would be required to increase their stock holdings in the Chicago Bank due to that year's general increase in outstanding home mortgage loans.

On December 29, 1978,[4] the Chicago Bank distributed the 1978 stock dividend by (1) crediting the appropriate number

[4]There is no explanation in the record for the discrepancy between the board of director's resolution declaring that the dividend would be payable to stockholders of record as of Dec. 31, 1978, and the fact that the stock dividend actually was paid on Dec. 29, 1978.

of whole shares of stock to the stock account of each member bank, (2) crediting an appropriate amount of cash with respect to fractional shares to the demand account of each member bank, and (3) issuing a new stock certificate to each member bank. Each new stock certificate reflected the total number of shares of stock held by each member bank before the stock dividend, the number of shares of stock distributed pursuant to the dividend, and the total number of shares of stock owned by each member bank after distribution of the dividend. The Chicago Bank maintained records of the stock ownership accounts of its member banks.

On December 29, 1978, a total of 234,620 shares of common stock was distributed by the Chicago Bank as a stock dividend to its 497 member banks. On December 29, 1978, Frontier Savings received 588 shares of common stock in the Chicago Bank (and cash representing fractional shares in the amount of $51.07) as its share of the 1978 stock dividend.

### Common Stock Purchases and Redemptions Relating to December 31, 1978, Stock Ownership Requirements

Enclosed with the December 22, 1978, bulletin mailed by the Chicago Bank to its member banks describing the 1978 stock dividend was a form entitled "Calculation of Bank Stock Requirement as of December 31, 1978." Using that form, each member bank could calculate the number of shares of stock it was required, under 12 U.S.C. sec. 1426(c) (1978), to own in the Chicago Bank as of December 31, 1978. If a member bank was required to purchase additional shares of stock, it could submit the form (reflecting the number of shares to be purchased) along with a check in payment therefor to the Chicago Bank. If the member bank held more shares than it legally was required to own, it could use the form to request the redemption of any excess shares. Although the Chicago Bank had no legal obligation to redeem excess shares, in prior years it routinely had done so.

On January 16, 1979, Frontier Savings completed the form calculating the number of shares of common stock in the Chicago Bank it was required to own based on its

December 31, 1978, outstanding balance for home mortgage loans. That calculation indicated that Frontier Savings was required to purchase 678 additional shares of common stock in the Chicago Bank (after taking into account the shares received as part of the common stock dividend on December 29, 1978). Frontier Savings, therefore, sent a check in the amount of $67,800 to the Chicago Bank and 678 shares were credited to its stock account at the Chicago Bank. A new stock certificate was issued reflecting the ownership by Frontier Savings of a total of 10,332 shares of common stock in the Chicago Bank. During 1979, none of the shares of common stock in the Chicago Bank owned by Frontier Savings were redeemed or otherwise transferred.

Exclusive of the December 29, 1978, stock dividend received, on December 31, 1978, 195 of the 497 member banks owned sufficient shares of common stock in the Chicago Bank to meet their stock ownership requirements, and 302 member banks did not own sufficient shares to meet their stock ownership requirements. After receipt of the 1978 stock dividend, 69 member banks requested that the Chicago Bank redeem all or some of their excess shares. All such redemption requests were agreed to by the Chicago Bank and the following number of shares of common stock were redeemed by the Chicago Bank from its member banks in the months indicated:

| Time period | Shares redeemed |
| --- | --- |
| December 1978 | 1,240 |
| January 1979 | 62,575 |
| February 1979 | 8,249 |
| Remainder of 1979 | 22,256 |

During December of 1978 and 1979, 45 member banks redeemed a number of shares of stock in the Chicago Bank that was equal to or that exceeded the number of shares they received as their portion of the 1978 stock dividend.

*1979 Cash and Stock Dividends*

At a meeting held on November 19, 1979, the board of directors of the Chicago Bank adopted a resolution, subject to the approval of the Federal Home Loan Bank Board, to pay a 10-percent dividend to its stockholders of record as of December 31, 1979, half of which would be paid in cash and

half of which would be paid in the form of common stock of the Chicago Bank. On December 13, 1979, the Federal Home Loan Bank Board approved payment by the Chicago Bank of the proposed cash and stock dividends. On December 21, 1979, the Chicago Bank mailed a bulletin to its member banks, informing them that the 10-percent dividend would be paid to the stockholders on December 31, 1979.

On December 31, 1979, the Chicago Bank distributed the 1979 dividends by (1) adding the appropriate number of whole shares of stock to the stock account of each member, and (2) adding to the demand account of each member the amount representing the cash portion of the dividend as well as the amount of cash representing fractional shares of stock distributed as part of the dividend. A total of 209,197 shares of stock was distributed by the Chicago Bank as a stock dividend to its 497 member banks on December 31, 1979. Frontier Savings received 514 shares of Chicago Bank common stock as its portion of the 1979 stock dividend and $51,567.87 in cash as its portion of the cash dividend.

### Common Stock Purchases, Sales, and Redemptions Relating to December 31, 1979, Stock Ownership Requirements

The December 21, 1979, bulletin mailed to member banks concerning the 1979 dividends explained that "to help preserve the non-taxable characteristics of the stock dividend" a new procedure was being adopted for the purchase and disposition of excess shares of stock in the Chicago Bank. Instead of having member banks purchase additional shares of stock from the Chicago Bank and instead of having the Chicago Bank redeem excess shares from member banks, the new procedure called for member banks who had excess shares they wished to dispose of to sell such excess shares to other member banks who wished to buy additional shares.

Enclosed with the December 21, 1979, bulletin was a form entitled "Calculation of Bank Stock Requirement" as of December 31, 1979, and a separate form that could be used by the member banks to notify the Illinois and Wisconsin

League Offices[5] of their desire to sell excess shares of stock in the Chicago Bank to other member banks. Each member bank was required to notify the Chicago Bank of any purchases of shares of stock in the Chicago Bank so the changes in ownership of the stock could be reflected on its records.

Frontier Savings completed its form for the "Calculation of Bank Stock Requirement" on January 29, 1980. Thereon, it was indicated that, based on its December 31, 1979, loan balance figures, Frontier Savings was required to purchase 520 additional shares of common stock in the Chicago Bank. Frontier Savings, therefore, mailed a $52,000 check to the Chicago Bank, and the Chicago Bank credited Frontier Savings with 520 shares of stock, increasing the total number of shares in petitioner's stock account to 11,366.

Exclusive of the December 31, 1979, stock dividends, 282 of the Chicago Bank's 497 member banks owned sufficient shares of stock in the Chicago Bank to meet their stock ownership requirements on December 31, 1979, and 215 member banks did not own sufficient shares. After receipt of their 1979 stock dividends from the Chicago Bank, 31 member banks sold some of their stock to other member banks, and 10 bought additional stock from member banks. A total of 85,859 shares of stock in the Chicago Bank was exchanged between member banks during December of 1979 and January of 1980.

Sales of excess shares between member banks occurred only in January of 1980. Excess shares that member banks wished to dispose of after January of 1980 were redeemed by the Chicago Bank. Between February 1, 1980, and December 31, 1980, 64 member banks requested the Chicago Bank to redeem their excess shares. Sixty member banks redeemed a number of shares that was equal to or that exceeded the number of shares they received as their portion of the 1979 stock dividend. The Chicago Bank honored all redemption requests received during that period of time and the following number of shares were redeemed in the months indicated:

---

[5]Although not explained in the record, apparently the Illinois and Wisconsin League offices were trade associations of member banks which agreed to act as intermediaries to effect the sales of stock between member banks in January of 1980.

| Time period | Shares redeemed |
|---|---|
| February 1980 ........................... | 177,254 |
| March 1980 .............................. | 61,837 |
| Remainder of 1980 ...................... | 43,199 |

None of the shares of stock in the Chicago Bank received by Frontier Savings with respect to the 1978 and 1979 stock dividends were redeemed by the Chicago Bank or otherwise disposed of by Frontier Savings prior to 1982. In January of 1982, the Chicago Bank, at the request of Frontier Savings, redeemed 3,584 shares of its stock owned by Frontier Savings.

## OPINION

The receipt of common stock dividends generally is not taxable to stockholders. Sec. 305(a). Where, however, dividends from a corporation are payable, at the election of the stockholders, in stock or property (such as cash), the receipt of dividends will be taxable to the stockholders under the provisions of section 301. Sec. 305(b)(1).[6] In that circumstance, the receipt of stock dividends will be taxable under sections 305(b)(1) and 301 regardless of whether the stockholders exercise their election to receive the dividends in cash or other property. Sec. 1.305-2(a), Income Tax Regs.[7]

---

[6] Sec. 305(a) and (b)(1) provide as follows:

(a) GENERAL RULE.—Except as otherwise provided in this section, gross income does not include the amount of any distribution of the stock of a corporation made by such corporation to its shareholders with respect to its stock.

(b) EXCEPTIONS.—Subsection (a) shall not apply to a distribution by a corporation of its stock, and the distribution shall be treated as a distribution of property to which section 301 applies—

　(1) DISTRIBUTIONS IN LIEU OF MONEY.—If the distribution is, at the election of any of the shareholders (whether exercised before or after the declaration thereof), payable either—

　　(A) in its stock, or,

　　(B) in property.

[7] Sec. 1.305-2(a), Income Tax Regs., provides in part as follows:

Distributions in lieu of money.

(a) In general.—Under section 305(b)(1), if any shareholder has the right to an election or option with respect to whether a distribution shall be made either in money or any other property, or in stock or rights to acquire stock of the distributing corporation, then, with respect to all shareholders, the distribution of stock or rights to acquire stock is treated as a distribution of property to which section 301 applies regardless of—

　(1) Whether the distribution is actually made in whole or in part in stock or in stock rights;

　(2) Whether the election or option is exercised or exercisable before or after the declaration of the distribution;

　(3) Whether the declaration of the distribution provides that the distribution will be made in one medium unless the shareholder specifically requests payment in the other;

Respondent argues that by redeeming all of the common stock it was requested to redeem from its member banks in 1979 and 1980 (and apparently doing so in years before 1979), the Chicago Bank established such a policy and practice of redeeming excess stock upon request of the member banks that the member banks should be regarded as having had an "election" to receive the 1978 and 1979 stock dividends in cash. Respondent therefore argues that the stock dividends in question do not qualify for exemption from taxability under section 305(a) and should be taxable to the member banks under sections 305(b)(1) and 301. For the reasons explained below, we disagree.

The Federal statute under which the Federal Home Loan Bank Board and the district banks regulate certain activities of member banks addresses the authority of district banks to redeem common stock from its member banks and explicitly describes that authority as discretionary with each district bank. Section 1426(c) of the Federal Home Loan Bank Act as amended in 1961 provides, in relevant part, as follows:

If the bank finds that the investment of any member in stock is greater than that required under this subsection it *may, unless prohibited by said Board* [i.e., the Federal Home Loan Bank Board] *or by the provisions of paragraph (2) of this subsection, in its discretion* and upon application of such member retire the stock of such member in excess of the amount so required. * * * [12 U.S.C. sec. 1426(c) (1961), as amended by Act of Sept. 8, 1961, subsec. (c), Pub. L. 87-210, 75 Stat. 482. Emphasis supplied.]

A comparison of the language quoted above (reflecting the 1961 amendment to section 1426(c)) with the language of the predecessor statute to section 1426(c) (as originally enacted in 1932) is particularly significant. As originally enacted, section 1426(c) of the Federal Home Loan Bank Act of 1932, *supra*, provided as follows:

If the board finds that the investment of any member in stock is greater than that required under this section, upon application of such member, *the bank shall pay such member for each share of stock in excess of the amount so required* an amount equal to the value of such stock * * *

---

(4) Whether the election governing the nature of the distribution is provided in the declaration of the distribution or in the corporate charter or arises from the circumstances of the distribution; or

(5) Whether all or part of the shareholders have the election.

[Federal Home Loan Bank Act of 1932, *supra*, sec. 1426(c). Emphasis supplied.]

The language quoted immediately above suggests that member banks may have had the right to require district banks to redeem excess shares before the 1961 amendment to section 1426(c) (12 U.S.C.). That is suggested by use in the statutory language of the mandatory "shall." Nothing, however, in the Federal Home Loan Bank Act, in its present form, suggests that since 1961 anyone other than the district banks and the Federal Home Loan Bank Board have the authority to determine whether excess shares will be redeemed.

The policy of the Chicago Bank with respect to the redemption of excess shares, as reflected in the minutes of the June 18, 1979, meeting of its board of directors, is entirely consistent with the above statutory provisions. Also, the bulletins mailed in December of 1978 and 1979 by the Chicago Bank to its members do not communicate any contrary policy to member banks. Those bulletins acknowledged that although the issuance of stock dividends was attributable, in part, to a perceived tax planning opportunity, the distributions of stock dividends also were attributable to the recognized need for a number of member banks to acquire additional shares of common stock in the Chicago Bank. With respect to the holding of excess shares, the bulletin dated December 22, 1978, simply suggested that member banks "may want to retire" such stock. The bulletin dated December 21, 1979, stated that it was "hoped that the majority of those holding excess stock will choose to hold the stock to meet future needs and for investment purposes," but that if they chose to sell excess shares to another member bank the league offices will "make every effort to bring you in contact with a member * * * willing to purchase" the excess shares. Neither bulletin suggested that the Chicago Bank necessarily would grant any or all redemption requests.

Congress vested in the district banks and in the Federal Home Loan Bank Board discretionary authority to redeem excess shares of common stock held by member banks. Our careful examination of the record herein satisfies us that the manner in which stock dividends were paid and redeemed in

1978 and 1979 by the Chicago Bank was consistent with that grant of discretionary authority and did not vest in the member banks the unilateral right to elect or to require the Chicago Bank to redeem excess shares upon request.

Respondent concedes that the Chicago Bank did not completely abdicate its discretionary authority to redeem its stock but respondent argues that that authority was exercised so consistently in favor of redemption that member banks, as a practical matter, had the option or election to have excess shares redeemed at any time. Respondent contends that the option arose "from the circumstances of the distribution," citing section 1.305-2(a)(4), Income Tax Regs. As indicated, we have carefully examined the circumstances of the stock dividends in question and conclude that the member banks, including Frontier Savings, did not have the option or election to have the Chicago Bank redeem excess shares of common stock in the Chicago Bank.

In addition to the factors explained above, we think it significant that the stock dividends of the Chicago Bank were declared and distributed in late December of 1978 and 1979. Member banks, however, normally would not be able to determine until early in the following year (after actual distribution of the stock dividends) whether they would be able even to request a redemption of some of their common stock in the Chicago Bank. In other words, on the day of distribution of the stock dividends, member banks could not know (other than through estimates and projections) whether they would be required to retain the stock dividends they received as part of their required investments in the district bank or whether the stock dividends would qualify as excess shares, in which case redemption thereof, if requested, might occur depending on the decision of the Chicago Bank.[8]

The parties have cited only one case that involves facts at all similar to those involved herein. In *Rinker v. United States*, 297 F. Supp. 370, 371 (S.D. Fla. 1968), the board of directors of a corporation adopted a resolution with respect

---

[8] In one case a member bank, apparently on Dec. 29, 1978, was able to determine that its stock dividend would constitute excess shares and was able to request a redemption on the same day the stock distribution occurred.

to stock dividends and the ability to redeem the stock dividends, as follows:

RESOLVED, that a stock dividend of 5% be paid to holders of record on March 31, 1960, on or before July 15, 1960, and that said dividends *may* be cashed at the request of the stockholders at a value per share yet to be determined. [Emphasis added.]

Among other factors, the District Court emphasized the use of the word "may" in the corporate resolution and held that the stockholders did not have an election to receive cash, in lieu of the stock dividends.

We recognize that the issuance by the Chicago Bank in 1978 and 1979 of stock dividends instead of or in addition to cash dividends was motivated in part by tax considerations. We cannot conclude, however, on the facts before us that the stock dividends were a mere subterfuge for cash distributions (see *Rinker v. United States, supra* at 372), or that the Chicago Bank had relinquished its discretionary authority to decline to grant stock redemption requests.

Respondent refers to Rev. Rul. 76-258, 1976-2 C.B. 95. Revenue Rulings are, of course, not binding on this Court. *Estate of Lang v. Commissioner*, 64 T.C. 404, 406-407 (1975), affd. 613 F.2d 770 (9th Cir. 1980). Respondent's litigating position herein is reflected in Rev. Rul. 83-68, 1983-1 C.B. 75. For the reasons explained above and under the facts of this case, we reject the conclusion reached therein that a history or practice of redemptions by the Chicago Bank makes the stock dividends received by petitioner herein taxable under sections 305(b)(1) and 301.

In light of our resolution of this issue, it is not necessary to address certain alternative arguments made by the parties.

*Decisions will be entered under Rule 155.*

Reviewed by the Court.

STERRETT, GOFFE, CHABOT, NIMS, PARKER, WHITAKER, KÖRNER, SHIELDS, HAMBLEN, COHEN, CLAPP, JACOBS, and PARR agree with the majority opinion.

SIMPSON, *J.*, dissents.

GERBER, WRIGHT, and WILLIAMS, *JJ.*, did not participate in the consideration of this case.

---

HAMBLEN, *J.*, concurring: I concur in the conclusion of the majority based upon the limited factual circumstances involved. If a discretionary act of the board of directors of a shareholder corporation to redeem stock dividends becomes a routine matter, it might, in my opinion, develop into an "option" that arises after the distribution or a distribution pursuant to a "plan." See secs. 1.305-2(a) and 1.305-3(b), Income Tax Regs. In such a situation, it seems the redemptions might be periodic rather than isolated. The broad rules of section 305 could invoke different considerations under other circumstances.

STERRETT, COHEN, and JACOBS, *JJ.*, agree with this concurring opinion.