854 F.2d 1001
 62 A.F.T.R.2d 88-5420, 57 USLW 2148, 88-2
USTC P 9458
 COLONIAL SAVINGS ASSOCIATION AND SUBSIDIARIES,
Petitioners-Appellants, Cross- Appellees,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee,
Cross-Appellant.
FRONTIER SAVINGS AND LOAN ASSOCIATION, Petitioner-Appellee,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellant.
 Nos. 87-1012, 87-1633, 87-1499 & 87-1500.
 United States Court of Appeals,
Seventh Circuit.
 Argued Dec. 3, 1987.
Decided Aug. 10, 1988.
Rehearing and Rehearing En Banc Denied in Nos. 87-1012 and
87-1663 Sept. 13, 1988.
 
 Robert A. Schnur, Best & Friedrich, Milwaukee, Wis., for petitioners-appellants, cross-appellees.
 Roger M. Olsen, Asst. Atty. Gen., Appellate Sec., Tax Div., Dept. of Justice, Washington, D.C., for respondent-appellee, cross-appellant.
 Before BAUER, Chief Judge, RIPPLE, Circuit Judge, and WILL, Senior District Judge.*
 RIPPLE, Circuit Judge.
 
 
 1
 These appeals present two separate questions of tax law, and require us to review two different decisions of the United States Tax Court.[1] The first issue is whether early withdrawal penalties received by banking institutions from depositors constitute discharge of indebtedness income to the institutions under section 108 of the Internal Revenue Code of 1954 (the Code). The second issue is whether shareholders of the Chicago Federal Home Loan Bank recognized income upon the receipt of stock dividends in 1978 and 1979, under section 305 of the Code, when none of the shareholders had a legal right to receive cash in lieu of stock, but the Chicago Federal Home Loan Bank had never refused any of its shareholders' redemption requests after a stock dividend.
 
 
 2
 In an opinion filed November 26, 1985, the Tax Court ruled that early withdrawal penalties constitute regular income to banking institutions and not discharge of indebtedness income. Colonial Sav. Ass'n v. Commissioner, 85 T.C. 855 (1985). In an opinion filed September 24, 1986, the Tax Court ruled that no shareholder of the Chicago Federal Home Loan Bank had an election to receive cash in lieu of stock, and that therefore the shareholders did not realize income upon the receipt of stock dividends. Frontier Sav. & Loan Ass'n v. Commissioner, 87 T.C. 665 (1986). We shall analyze each issue separately. For the reasons set forth in the following opinion, we affirm both decisions of the Tax Court.
 
 
 3
 * Early Withdrawal Penalties
 
 A. Facts
 
 4
 The facts of this case have been stipulated. The appellant is Colonial Savings Association (Colonial), a Wisconsin savings and loan association. Colonial filed a timely corporation income tax return for its taxable year ended June 30, 1980, with the Internal Revenue Service (the IRS). On July 29, 1982, the IRS issued Colonial a notice of deficiency. On October 19, 1982, Colonial filed a timely petition with the United States Tax Court. One of the subjects of dispute between Colonial and the IRS was Colonial's treatment of early withdrawal penalties that it had received from depositors who prematurely had withdrawn amounts from their accounts. The IRS contended that these penalties were regular income to Colonial. Colonial submitted that these penalties were discharge of indebtedness income, and therefore were subject to favorable tax treatment as existed under section 108 of the Code at that time.[2]
 
 
 5
 During its taxable year ended June 30, 1980, Colonial had various types of savings accounts outstanding, differing from each other in term, interest rate and other particulars. Interest on all of the accounts in question was computed on a daily basis and added each day to the depositors' accounts. The parties agree that a bona fide indebtedness existed between Colonial and its depositors on any given day equal to the amount of principal and accrued interest on each account. Although Colonial used the cash method of accounting for tax purposes, Colonial deducted under section 591 of the Code the year's aggregate of interest that had been credited to its depositors' accounts.
 
 
 6
 When a depositor withdrew the principal balance in any of the accounts in question prior to the account's maturity date, the depositor was required by federal regulation to pay a penalty to Colonial. See 12 C.F.R. Sec. 526.7(a) (1979) & 12 C.F.R. Sec. 526.7(a) (1980). The amount of this penalty was prescribed by the same federal regulations.[3] Under terms of the account between the depositor and Colonial, the penalty was paid by reducing the amount that Colonial gave the depositor upon withdrawal.
 
 
 7
 During the tax year at issue, Colonial received $600,744.88 in early withdrawal penalties. The parties agree that at least 90 percent of the early withdrawals were motivated by rapidly increasing interest rates. That is, because of an increase in interest rates, depositors determined that they were better off paying the penalty rather than leaving their money in an account that paid below-market interest rates.
 
 B. The Tax Court Opinion
 
 8
 The Tax Court determined that early withdrawal penalties were regular income and not discharge of indebtedness income. The court acknowledged that a debtor does not have income from the discharge of indebtedness "if the debt forgiveness is simply the method by which a creditor makes a payment to a debtor." Colonial Sav. Ass'n v. Commissioner, 85 T.C. 855, 866 (1985). The court then said that the facts and circumstances of early withdrawal penalties did "not give rise to cancellation or discharge of the debt." Id. Rather, the court believed that the "penalty or forfeiture was an obligation of the depositor, which petitioner and depositor agreed, in advance, could be satisfied from interest credited or principal deposited in the account." Id. at 867.
 
 
 9
 The court also noted that Colonial had no need for relief from discharge of indebtedness income. The court said that Colonial had had the use of depositors' funds, and had received a tax deduction for interest credited to the depositors' account, even though no interest actually had been paid. Thus, there was no hardship to Colonial from having to recognize income immediately.
 
 C. Contentions of the Parties
 
 10
 Colonial argues that early withdrawal penalties represent a reduction in the debt that Colonial owes the depositor. Colonial points out that both parties agree that a debtor-creditor relationship exists between Colonial and the depositor, and that savings accounts represent a bona fide indebtedness. Thus, when a depositor withdraws his account prematurely, the withdrawal penalty represents a reduction in the amount Colonial owes the depositor. Colonial therefore submits that the early withdrawal penalty is not a separate and distinct obligation from the indebtedness, but is simply a reduction in the amount that the depositor owes Colonial.
 
 
 11
 The IRS submits that the early withdrawal penalty represents a separate obligation from the depositor to Colonial. The IRS argues that, in effect, a depositor receives from Colonial the full amount of his account, but then pays back to Colonial a portion of that amount as a penalty. According to this theory, the discharge of indebtedness is merely the medium of payment of the penalty, and the early withdrawal penalty is regular income to Colonial.
 
 D. Discussion
 
 12
 In essence, the parties ask that we choose between two characterizations of withdrawal penalty income. The taxpayer submits that such income is income from the discharge of indebtedness, the Commissioner submits that it is regular income.[4] Determining which of these characterizations is most appropriate involves a two-step inquiry. First, we must examine the statutory scheme. While it hardly provides us with a definitive answer, this legislative framework is indispensible because our task is to give effect to the congressional intent, however obscure its expression. Second, we must analyze this particular banking transaction in light of the statutory framework and decide upon a characterization that seems most in harmony with the congressional intent.
 
 1. The Statutory Framework
 
 13
 Section 61(a) of the Code provides that gross income means all income, from whatever source derived, including "[i]ncome from discharge of indebtedness." 26 U.S.C. Sec. 61(a)(12). As a general rule, a taxpayer may realize income from the discharge of indebtedness when the taxpayer's debt is forgiven, cancelled, or otherwise discharged for less than the face amount of the debt. United States v. Kirby Lumber Co., 284 U.S. 1, 52 S.Ct. 4, 76 L.Ed 131 (1931). This general proposition is subject to several exceptions. For the tax year in question here, section 108 of the Code provided in pertinent part:
 
 
 14
 No amount shall be included in gross income by reason of the discharge, in whole or in part, within the taxable year, of any indebtedness for which the taxpayer is liable, or subject to which the taxpayer holds property, if--
 
 
 15
 (1) the indebtedness was incurred or assumed--
 
 
 16
 (A) by a corporation, or
 
 
 17
 (B) by an individual in connection with property used in his trade or business....
 
 
 18
 26 U.S.C. Sec. 108 (1976). If a taxpayer qualified for section 108 treatment, it was necessary that it file an election agreeing to make certain negative adjustments in the tax basis of its assets. Colonial filed such an election here.
 
 
 19
 The legislative history of section 108 evidences that it is the product of a congressional concern that a corporation receiving a forgiveness of indebtedness ought not be required to pay an immediate tax on the paper increase in its value; the transaction did not produce assets that can be used in paying the tax. Congress apparently believed that immediate taxation of debt discharges would discourage taxpayers from reducing their indebtedness. H.R.Rep. No. 855, 76th Cong., 1st Sess. 5, reprinted in 1939-2 C.B. 504, 507; S.Rep. No. 1631, 77th Cong., 2d Sess. 46, 78, reprinted in 1942-2 C.B. 504, 542; see also 97 Cong.Rec. 3796 (1951) (statement of Rep. Camp). Rather, under section 108, the tax liability may be handled through an adjustment in the basis of the corporation's existing assets. While section 108 has undergone a textual metamorphosis throughout its statutory life,[5] we discern no basic shift in its purpose. The case law interpreting the section, while sparse, is consistent with this legislative intent. For instance, in Reliable Incubator & Brooder Co. v. Commissioner, 6 T.C. 919, 926-27 (1946), the taxpayer-debtor had an obligation of $6,700 on which he was obliged to make $50 monthly payments. His creditor was in need of funds. Therefore, the parties agreed to reduce the outstanding debt by $1,200 in exchange for an advance payment of $600. While factors not relevant here precluded relief for the taxpayer,[6] the tax court did determine that there was $600 of income from discharge of indebtedness to the taxpayer-debtor. Similarly, in Columbia Gas System v. United States, 473 F.2d 1244 (2d Cir.1973), and San Marcos Hotel Co. v. Commissioner, 11 T.C.M. 388 (1952), aff'd, 205 F.2d 641 (9th Cir.1953), discharges of indebtedness occurred when creditors accepted less than full value for the amounts they were owed in return for the benefit of early payment.
 
 
 20
 In each of the foregoing cases, the literal mandate of section 108 was followed. The taxpayer-debtor's income was received "by reason of the discharge (in whole or in part) of indebtedness of the taxpayer." 26 U.S.C. Sec. 108 (emphasis supplied). By contrast, when the discharge of indebtedness is a mere medium for the payment of a separate obligation between two parties, section 108 does not apply. If this were not the rule, taxpayers often could evade the recognition of ordinary income by structuring the receipt of income as a discharge of indebtedness. For instance, in an often-used example, an employee who owes a debt to his employer could avoid the recognition of income by merely asking his employer to withhold his wages as payment of the indebtedness. See generally Bittker & Thompson, Income From the Discharge of Indebtedness: The Progeny of United States v. Kirby Lumber Co., 66 Cal.L.Rev. 1159, 1174 (1978). In Spartan Petroleum Co. v. United States, 437 F.Supp. 733 (D.S.C.1977), a gasoline distributor was indebted to its franchisor Atlantic Richfield Company (ARCO). ARCO sought to cancel its franchise agreement with the debtor. In order to achieve this result, ARCO agreed to pay more than a million dollars to the debtor and forgive the debt. The Tax Court correctly concluded that this cancellation of indebtedness was not a section 108 discharge because the forgiveness of the indebtedness was a payment to the distributor in return for cancelling the franchise agreements. Similarly, in OKC Corp. v. Commissioner, 82 T.C. 638 (1984), an oil company agreed to forgive indebtedness of the taxpayer in return for the taxpayer's agreement to cancel an output contract. In these cases, unlike those discussed earlier, the taxpayer-debtor received income in payment of a separate obligation, not "by reason of the discharge ... of indebtedness of the taxpayer." 26 U.S.C. Sec. 108.
 
 
 21
 2. Application to Early Withdrawal Penalties
 
 
 22
 We begin by placing our inquiry in a procedural framework. Colonial, relying on section 108, seeks to exempt income from current taxation. Therefore, Colonial has the burden of establishing that it qualifies for discharge of indebtedness treatment. Templeton v. Commissioner, 719 F.2d 1408, 1411 (7th Cir.1983); Hintz v. Commissioner, 712 F.2d 281, 284 (7th Cir.1983). The burden is upon the taxpayer because exemptions and deductions from income are extensions of legislative grace; deductions are not matters of right. Templeton, 719 F.2d at 1411. With respect to a taxpayer's qualification for a deduction, it is presumed that the determinations of the Commissioner are correct. Id. A taxpayer is entitled to a deduction only if there is clear provision for the favorable tax treatment. Id.
 
 
 23
 In attempting to meet this burden, Colonial states its position succinctly:
 
 
 24
 An early withdrawal forfeiture (whether or not designated a "penalty") is nothing more than an agreed-upon reduction in the financial institution's obligation to repay its entire debt and it would not even come into existence except for such repayment.
 
 
 25
 Colonial's Br. at 21. On the other hand, the Commissioner characterizes the facts differently. In his view, "Colonial did not have income 'by reason of the discharge' of indebtedness; it had income 'by reason of' receiving a penalty." Commissioner's Br. at 29.
 
 
 26
 In assessing the validity of these competing characterizations, we do not believe that the technical mechanics of the transaction ought to control the tax consequences. Rather, we must focus on the essential nature of the transaction. See Bowers v. Kerbaugh-Empire Co., 271 U.S. 170, 174, 46 S.Ct. 449, 451, 70 L.Ed. 886 (1926). Therefore, we must inquire into the nature of the "penalty" and determine whether it can be characterized properly as the sort of debt forgiveness that falls within the ambit of section 108. The fact that Colonial offset the amount of the penalty the depositor owed Colonial against the amount of principal and accrued interest is hardly controlling.
 
 
 27
 Even when we put to one side the mechanics of the transaction, we must admit that there is an initial appeal to Colonial's argument that the penalty is debt forgiveness. After all, whether the penalty is paid out of the funds in the bank's custody or by the depositor's funds from other sources, the effect of the penalty is to ensure that Colonial's net obligation to its depositor is far less than it otherwise would have been.
 
 
 28
 On the other hand, there are several significant factors that militate against such a characterization. The penalty, as imposed by federal banking regulations, arises only at the time of the depositor's demand for withdrawal of his funds prior to the agreed term. It is a fee that the bank must impose on its depositor as consideration for altering the earlier contractual commitment of the funds for a longer period. The penalty serves to recognize that such changes in course, by those whom the Bank regarded as long-term depositors, involve significant instability and therefore significant costs for banks. The regulations also impose these penalties to ensure the systemic health of the nation's banking institutions by allowing those institutions to more "effectively ... manage their liabilities." 45 Fed.Reg. 37,802 (1980).
 
 
 29
 At the very least, the transaction before us cannot be described as a typical section 108 transaction. As the cases demonstrate, in the usual section 108 transaction, there is the direct forgiveness of a debt, or a portion of a debt, that adds value to the worth of the debtor's business--although it does not add cash. Therefore, in those circumstances, it makes sense to reflect that enhanced value to the enterprise through an adjustment of the corporation's assets. Here, by contrast, the debtor receives a payment from the creditor. Moreover, that payment is to compensate the bank-debtor for the harm done by the depositor's change in position. It is a form of liquidated damages for the added expense that the bank must suffer in an effort to procure the funds that have been lost. In this regard, it plays a role in the debtor-creditor relationship not unlike that played by other "penalties" enacted when one party to a transaction changes course and, in so doing, upsets the settled expectations of the other party. While the income produced by the penalty arose out of a debtor-creditor relationship, it did not arise "by reason of the discharge of indebtedness." Rather, it arose by reason of the creditor's alteration of the parties' contract and the consequential expenses of the bank/debtor.
 
 
 30
 We believe that the penalty involved here is sufficiently different from the usual circumstance governed by section 108 that Congress can be expected to have addressed specifically any special tax consequences surrounding its use. Congress clearly is aware of the tax problems caused by these financial arrangements. While it has chosen to address certain aspects of those tax consequences, it has chosen not to address this one. Since at least 1973 Congress has been on notice that the IRS views the early withdrawal penalty as a separate obligation rather than as a part of the underlying deposit/debt. In that year, the IRS issued Revenue Ruling 73-511, 1973-2 C.B. 402, in which the IRS required financial institutions to report on information returns the full amount of interest credited to depositors' accounts without reduction for any early withdrawal penalties that might have been incurred during the taxable year. This ruling was based on the rationale that early withdrawal penalties were considered separate obligations of the depositor to the bank. As a result of this ruling, it has been settled law since 1973 that taxpayers who have paid early withdrawal penalties may not merely reduce their interest income by the amount of the penalty. Rather, taxpayers must recognize the full amount of any interest income they have earned, and then they must claim early withdrawal penalties as a separate adjustment to their gross income. 26 U.S.C. Sec. 61(a)(9).
 
 
 31
 Congress was immediately aware of Revenue Ruling 73-511 and took action to soften its impact for certain taxpayers. Congress enacted Pub.L. No. 93-483, Sec. 6(a), 88 Stat. 1458, (codified as amended at 26 U.S.C. Sec. 61(a)(9)), one year after the ruling, which allowed all taxpayers, not just those who itemize deductions, to deduct early withdrawal penalties as an adjustment to gross income. However, nothing in this legislation or in its legislative history expresses disapproval of the revenue ruling's conclusion that interest income and early withdrawal penalties are separate and distinct obligations, and that interest income and penalties cannot be set off for income tax purposes. In our view, this congressional response to Revenue Ruling 73-511 demonstrates that Congress is fully aware of the IRS's characterization of early withdrawal penalties, and that Congress does not disapprove. In such a circumstance, we cannot say that the IRS's position contravenes congressional intentions.
 
 
 32
 For the foregoing reasons, we conclude that early withdrawal penalties represent separate obligations from depositors to Colonial, and that therefore early withdrawal penalties are not income by reason of the discharge of indebtedness as that term is used in section 108 of the Code. Colonial has not met its burden of establishing that the IRS has erroneously determined that such payments constitute ordinary income.
 
 II
 Federal Home Loan Bank Dividends
 A. Facts
 
 33
 In these appeals, Nos. 87-1633, 87-1499, and 87-1500, we must determine whether banking institutions received income upon receipt of stock dividends in 1979 and 1980 from the Federal Home Loan Bank of Chicago (the Chicago Bank). The relevant facts at issue in these appeals were described in detail by the Tax Court. We borrow heavily from its rendition.
 
 
 34
 Petitioner, Frontier Savings Association (Frontier),[7] is a Wisconsin savings and loan association. Frontier has been a member and stockholder of the Chicago Bank at all times since the organization of the Chicago Bank. The Chicago Bank is one of eleven district banks established pursuant to the Federal Home Loan Bank Act, 12 U.S.C. Sec. 1421 et seq. The district banks initially were capitalized with stock subscriptions from member institutions and the United States Treasury. District banks operate under the supervision of the Federal Home Loan Bank Board (the Bank Board), an administrative agency in the executive branch of the federal government. 12 U.S.C. Sec. 1437(b). The district banks are subject to extensive managerial supervision by the Bank Board. Among other responsibilities, the Bank Board appoints six of each bank's fourteen directors, 12 U.S.C. Sec. 1427(a), designates the bank's chairman and vice chairman, 12 U.S.C. Sec. 1427(g), and has the power to suspend or remove the bank's directors, officers, employees, and agents, 12 U.S.C. Sec. 1437(a).
 
 
 35
 The Federal Home Loan Bank system was designed primarily as a reserve credit facility for savings and loan associations and other home mortgage credit institutions. Savings and loan associations (such as Frontier) and mutual savings banks that are members or stockholders in the district banks are required by federal law to maintain a certain capital stock ownership in the respective district banks of which they are members. The stock ownership requirements are determined at the end of each calendar year and are calculated with reference to each member bank's net home mortgage loans outstanding and total borrowings of each member from the district bank.
 
 
 36
 Each member bank generally must maintain a capital stock ownership interest in the district bank in an amount equal to at least one percent of the total outstanding balance of its home mortgage loans and at least equal to a certain percentage of outstanding borrowings of the member bank from the district bank, as of December 31 of each year.[8] Each share of stock in the district banks is valued by statute at its $100 par value. See 12 U.S.C. Sec. 1426(b), (c). Based upon the above year-end calculations, member banks that are required to purchase additional stock of district banks must do so by January 31 of the following year. Member banks that own stock in district banks in excess of the required number of shares may request that excess shares be redeemed by the district banks. By statute, district banks are authorized to redeem excess shares, within the discretion of the district bank. 12 U.S.C. Sec. 1426(c)(1).
 
 
 37
 The policy of the Chicago Bank with respect to the redemption of excess shares is reflected in the minutes of a June 18, 1979 meeting of the Chicago Bank's board of directors, as follows:
 
 
 38
 BE IT RESOLVED, that the President of the Bank or any officer designated by him may from time to time increase or decrease the amount of stock of any member in accordance with Section 6 of the Federal Home Loan Bank Act [i.e., 12 U.S.C. Sec. 1426(c) ] and the Regulations for the Federal Home Loan Bank System; provided, however, that in exercising the Bank's discretion whether or not to grant an application by a member to decrease its stock, the President or his designee shall be guided by all applicable statutory and regulatory provisions, all policies and standards adopted from time to time by this Board, including, but not limited to, the Bank's credit standards contained in the "Policies Governing Extension of Credit" as adopted by this Board and all relevant facts and circumstances.
 
 
 39
 However, the decision to redeem a member's stock is not entirely within the judgment of the district bank. Federal statute allows the Bank Board to prohibit a particular redemption. 12 U.S.C. Sec. 1426(c).
 
 
 40
 As stockholders in district banks, member banks are entitled to receive dividends that are declared by district banks. Prior to December 29, 1978, dividends always had been paid by the Chicago Bank to its member banks in cash. On that date, dividends were paid by the Chicago Bank to its member banks in the form of additional shares of common stock. On December 31, 1979, dividends were paid by the Chicago Bank to its member banks half in stock and half in cash.
 
 December 29, 1978, Stock Dividend
 
 41
 At a meeting on November 20, 1978, the board of directors of the Chicago Bank adopted a resolution to pay a 6.58 percent dividend to its stockholders of record as of December 31, 1978. Subject to the approval of the Bank Board, the resolution stated that the dividend would be paid in the form of stock in the Chicago Bank. On December 22, 1978, the Director of the Office of District Banks, Federal Home Loan Bank Board, wrote a letter to the President of the Chicago Bank approving the stock dividend.
 
 
 42
 On December 22, 1978, the Chicago Bank mailed a bulletin to its member banks informing them that a 6.58 percent stock dividend would be paid. The explanation made in the bulletin for paying a stock dividend, rather than a cash dividend, was as follows:
 
 
 43
 (1) Providing a stock rather than a cash dividend may enable your association to defer the payment of income taxes on the value of the stock dividend. You may wish to consult your tax adviser for the proper handling of a stock dividend.
 
 
 44
 (2) A stock dividend can be applied toward satisfying the stock investment requirement for members that experienced a growth in assets during 1978 or that will be required to purchase additional stock due to increased borrowings from the Bank.
 
 
 45
 The bulletin also explained that most member banks would be required to increase their stock holdings in the Chicago Bank due to that year's general increase in outstanding home mortgage loans. On December 29, 1978, a total of 234,620 shares of common stock was distributed by the Chicago Bank as a stock dividend to its 497 member banks. Frontier received 588 shares of common stock in the Chicago Bank (and cash representing fractional shares in the amount of $51.07) as its share of the 1978 stock dividend.
 
 
 46
 Enclosed with the December 22, 1978 bulletin mailed by the Chicago Bank to its member banks describing the 1978 stock dividend was a form entitled "Calculation of Bank Stock Requirement as of December 31, 1978." Using that form, each member bank could calculate the number of shares of stock it was required to own in the Chicago Bank as of December 31, 1978. If a member bank was required to purchase additional shares of stock, it could submit the form (reflecting the number of shares to be purchased) along with payment to the Chicago Bank. If the member bank held more shares than it legally was required to own, it could use the form to request the redemption of any excess shares. Although the Chicago Bank had no legal obligation to redeem excess shares, it had never declined a redemption request.
 
 
 47
 On January 16, 1979, Frontier completed the form calculating the number of shares of common stock in the Chicago Bank it was required to own. That calculation indicated that Frontier needed to purchase 678 additional shares of common stock in the Chicago Bank (after taking into account the shares received as part of the common stock dividend on December 29, 1978). During 1979, none of the shares of common stock in the Chicago Bank owned by Frontier were redeemed or otherwise transferred. However, 69 member banks requested that the Chicago Bank redeem at least some of their shares. The Chicago Bank honored all of these requests. Forty-five member banks redeemed at least as many shares as they had received in the stock dividend.
 
 December 31, 1979 Cash and Stock Dividends
 
 48
 At a meeting on November 19, 1979, the board of directors of the Chicago Bank adopted a resolution, subject to the approval of the Bank Board, to pay a 10 percent divident to its stockholders of record as of December 31, 1979, half of which would be paid in cash and half of which would be paid in common stock. The Bank Board approved this dividend. On December 21, 1979, the Chicago Bank mailed a bulletin to its member banks informing them of the dividend. On December 31, 1979, the Chicago Bank distributed the 1979 dividends by (1) adding the appropriate number of whole shares of stock to the stock account of each member, and (2) adding to the demand account of each member the amount representing the cash portion of the dividend as well as the amount of cash representing fractional shares of stock distributed as part of the dividend. Frontier received 514 shares of Chicago Bank common stock and $51,567.87 in cash as its portion of the dividend.
 
 
 49
 The December 21, 1979 bulletin mailed to member banks concerning the 1979 dividends explained that "to help preserve the non-taxable characteristics of the stock dividend" a new procedure was being adopted for the purchase and disposition of excess shares. Instead of having member banks purchase additional shares of stock from the Chicago Bank and having the Chicago Bank redeem excess shares from member banks, the new procedure called for member banks who had excess shares they wished to dispose of to sell such excess shares to other member banks who wished to buy additional shares. Enclosed with the December 21, 1979 bulletin was a form entitled "Calculation of Bank Stock Requirement" as of December 31, 1979, and a separate form that could be used by the member banks to express their desire to sell excess shares of stock in the Chicago Bank to other member banks. Frontier calculated that it needed to purchase 520 additional shares of common stock in the Chicago Bank. Frontier therefore mailed a $52,000 check to the Chicago Bank and was credited with 520 shares of stock.
 
 
 50
 Exclusive of the December 31, 1979 stock dividends, 282 of the Chicago Bank's 497 member banks owned sufficient shares of stock in the Chicago Bank to meet their stock ownership requirements on December 31, 1979. After receipt of their 1979 stock dividends from the Chicago Bank, 31 member banks sold some of their stock to other member banks and 10 bought additional stock from member banks. Sales of excess shares between member banks occurred only in January 1980. Excess shares that member banks wished to dispose of after January 1980 were redeemed by the Chicago Bank. Between February 1, 1980, and December 31, 1980, 64 member banks asked the Chicago Bank to redeem their excess shares. All of these requests were honored. Sixty of the 64 asked to have redeemed a number of shares that was equal to or exceeded the number of shares they received as their portion of the 1979 stock dividend. None of the shares of stock received by Frontier were redeemed in 1980. In January 1982, Frontier asked the Chicago Bank to redeem 3,584 shares. The request was honored.
 
 
 51
 Frontier did not report the 1978 and 1979 stock dividends as income on its tax returns for either 1978 or 1979. The IRS determined that the 1978 dividend was includible in Frontier's income in 1978 in the amount of $58,576.20, and that the 1979 dividend was includible in Frontier's income for 1979 in the amount of $51,230. Frontier then petitioned the Tax Court seeking review of the IRS's claimed deficiencies.
 
 B. The Tax Court Opinion
 
 52
 Section 305(a) of the Code sets forth the general rule that stock dividends are customarily not includible in a shareholder's gross income. However, section 305(b)(1) of the Code provides that a stock dividend is taxable if the dividend is payable in either stock or property "at the election of any of the shareholders...." 26 U.S.C. Sec. 305(b)(1). The IRS argues that such an election was present here because the Chicago Bank had never refused a redemption request.
 
 
 53
 In a decision by Judge Swift,[9] the Tax Court concluded that the Chicago Bank was not required to redeem excess shares, but rather chose to do so at its discretion. Frontier Sav. Ass'n v. Commissioner, 87 T.C. 665 (1986).[10] Because the Chicago Bank retained this discretion, the court concluded that member banks "did not have the option or election to have the Chicago Bank redeem excess shares...." Id. at 677. In response to the IRS's contention that the Chicago Bank had, in effect, abdicated its discretion, the Court said:
 
 
 54
 Our careful examination of the record herein satisfies us that the manner in which stock dividends were paid and redeemed in 1978 and 1979 by the Chicago Bank was consistent with that grant of discretionary authority and did not vest in the member banks the unilateral right to elect or to require the Chicago Bank to redeem excess shares upon request.
 
 
 55
 Id. at 676-77.
 
 
 56
 The Tax Court also noted that, at the time stock dividends were declared and distributed in 1978 and 1979, member banks did not yet know whether they would be entitled to request a redemption. Referring to the date of distribution, the court said that "member banks could not know (other than through estimates and projections) whether they would be required to retain the stock dividends they received as part of their required investments in the district bank or whether the stock dividends would qualify as excess shares...." Id. at 677.
 
 
 57
 In a concurring opinion, Judge Hamblen, joined by three other judges, joined in the majority's conclusion "based upon the limited factual circumstances involved." Id. at 679. He opined that an election might exist under section 305(b)(1) if the decision to redeem stock dividends "becomes a routine matter." Id.
 
 C. Contentions of the IRS
 
 58
 The IRS emphasizes that the Chicago Bank has never declined a request to redeem excess shares. Because of that circumstance, the IRS submits that there is "no doubt that the shareholders for whom the dividend shares were excess shares had, as a practical matter, an election to redeem those shares for cash." Commissioner's Br. at 17. The IRS further submits that the analysis of the Tax Court is wrong because, under that analysis, a shareholder does not have an election to receive stock or property unless that shareholder has a legally binding right to demand redemption. According to the IRS, nothing in section 305 suggests that "its application should turn on the niceties of a shareholder's legal rights." Id. Rather, argues the IRS, the existence of an election ought to be premised on an evaluation of all the circumstances of a dividend. Under such a test, the IRS contends that, as a practical matter, an election existed here and the shareholders should be deemed to have received income according to the value of the stock dividends received.
 
 D. Discussion
 
 59
 Section 305(a) of the Code establishes the general rule that stock dividends are not taxable to the recipient.[11] The rationale for this rule is that a pure "stock dividend is commonly thought of as a mere readjustment of the stockholder's interest, and not as income." S.Rep. No. 552, 91st Cong., 1st Sess. 150, reprinted in 1969-3 C.B. 423, 519, U.S.Code Cong. & Admin.News 1969, p. 1645. However, section 305(b) of the Code identifies several situations in which the receipt of a stock dividend will generate taxable income. The exception to the general rule relevant here is section 305(b)(1), which provides that a stock dividend is taxable "[i]f the distribution is, at the election of any of the shareholders (whether exercised before or after the declaration thereof), payable either--(A) in its stock, or (B) in property." 26 U.S.C. Sec. 305(b)(1). The reason behind this exception to the general rule is that, when such an election exists, "the stockholder who receives a stock dividend is in the same position as if he received a taxable cash dividend and purchased additional stock with the proceeds. His interest in the corporation is increased relative to the interests of stockholders who took dividends in cash." S.Rep. No. 552, supra, reprinted in 1969-3 C.B. 423, 519, U.S.Code Cong. & Admin.News 1969, p. 2182.
 
 
 60
 The issue presented here is whether any of the shareholders of the Chicago Bank had an "election" to receive dividends in stock or cash when many shareholders of the Bank redeemed their stock dividend soon after it was distributed. We agree with the Tax Court that the federal statute governing stock redemptions by Federal Home Loan Banks is of substantial importance to a resolution of the precise question before us. That statute, 12 U.S.C. Sec. 1426(c), provides that a Federal Home Loan Bank is not required to honor any redemption request. Rather, the statute notes that redemption requests shall only be granted within the discretion of the local bank, and further provides that the Bank Board may prohibit a redemption. The statute reads:
 
 
 61
 If the bank finds that the investment of any member in stock is greater than that required under this subsection it may, unless prohibited by said Board [i.e., the Federal Home Loan Bank Board] or by the provisions of paragraph (2) of this subsection, in its discretion and upon application of such member retire the stock of such member in excess of the amount so required.
 
 
 62
 12 U.S.C. Sec. 1426(c)(1). This statute has not always so limited the right of a member bank to redeem its stock, however. Prior to 1961, section 1426(c) affirmatively required Federal Home Loan Banks to redeem the shares of a member bank when that member requested a redemption and held the statutorily required number of shares. Although the legislative history is silent on why Congress made this change in 1961, we can only conclude that Congress made the change because it intended for Federal Home Loan Banks to have flexibility in handling redemptions.
 
 
 63
 Despite the statute, the IRS takes the position that the granting of redemption requests had become so routine at the Chicago Bank that, as a practical matter, shareholders did have an election to choose cash rather than stock. Without deciding whether the IRS's proposed standard for defining an "election" is the correct one, we conclude that the shareholders of the Chicago Bank did not have an election here. Having examined the record and all relevant facts, we are persuaded that the local officials of the Chicago Bank have not abdicated their obligation under the statutory directive of section 1426(c) to exercise discretion.
 
 
 64
 The Chicago Bank is, at present, one of eleven regional banks that operate under the supervisory and regulatory authority of the Bank Board, an independent federal agency. The Chicago Bank was created by the Bank Board "to accomplish federal objectives and is closely regulated in order to promote these objectives." Fidelity Fin. Corp. v. Federal Home Loan Bank, 792 F.2d 1432, 1435 (9th Cir.1986), cert. denied, 479 U.S. 1064, 107 S.Ct. 949, 93 L.Ed.2d 998 (1987). Those federal objectives are "to alleviate the pressing need of home owners for 'low-cost, long-term, installment mortgage money' and to 'decrease costs of mortgage money' with a 'resulting benefit to home ownership in the form of lower costs and more liberal loans.' " Laurens Fed. Sav. & Loan Ass'n v. South Carolina Tax Comm., 365 U.S. 517, 522, 81 S.Ct. 719, 721, 5 L.Ed.2d 749 (1961) (quoting H.R.Rep. No. 1418, 72d Cong., 1st Sess. 8-10; S.Rep. No. 837, 72d Cong., 1st Sess. 9-11). There is little doubt that Congress intended the public-at-large to be the beneficiaries of the Federal Home Loan Bank system. Fidelity Fin. Corp. v. Federal Home Loan Bank, 589 F.Supp. 885, 890 (N.D.Cal.1983), aff'd, 792 F.2d 1432 (9th Cir.1986).
 
 
 65
 The Bank Board, a federal agency, appoints six of the Chicago Bank's fourteen directors, it designates the Bank's chairman and vice chairman, and it has the power to suspend or remove any of the Bank's directors, officers, employees, or agents. 12 U.S.C. Secs. 1427(g), 1437(a). Moreover, the Bank Board must approve all dividends issued by the Chicago Bank, and it retains the authority to prohibit a stock redemption, even if the Chicago Bank has approved the redemption. According to one court, this statutory scheme "reveal[s] an intention on the part of Congress to retain the broadest kind of federal control over the number, powers and existence of these purely legislative creatures." Fahey v. O'Melveny & Myers, 200 F.2d 420, 443 (9th Cir.1952), cert. denied, 345 U.S. 952, 73 S.Ct. 864, 97 L.Ed.2d 1374 (1953). That court also noted that funds handled by district banks "are used only in the performance of public and governmental functions," id. at 445, and that "a Federal Home Loan Bank is a federal instrumentality organized to carry out public policy and its functions are wholly governmental ...," id. at 446.
 
 
 66
 We cannot say, on the basis of this record, that the officials of the Chicago Bank disregarded totally their statutory obligations. We notice, as did the Tax Court, that the directors of the Chicago Bank expressly enunciated the standards that would be evaluated when contemplating redemption applications. The Board's resolution instructed the Bank's day-to-day leadership to "be guided by all applicable statutory and regulatory provisions," and by "all policies and standards adopted from time to time by this Board...." In view of that resolution and of the other facts mentioned, we are persuaded that the shareholders of the Chicago Bank did not have an "election" to receive cash instead of stock.
 
 
 67
 We believe that the Tax Court resolved correctly the narrow issue presented to it. The officials of the Chicago Bank acted pursuant to federal statutory authority in determining whether to redeem stock tendered by individual banking institutions. This exercise of discretion pursuant to federal regulatory authority hardly vests in the shareholder banks an election to receive the dividend in cash rather than stock.
 
 Conclusion
 
 68
 The decision of the Tax Court that early withdrawal penalties are not income by reason of the discharge of indebtedness is affirmed. The decision of the Tax Court that shareholders of the Chicago Bank did not have an election to receive cash instead of stock is affirmed.
 
 AFFIRMED
 
 
 *
 The Honorable Hubert L. Will, Senior District Judge for the Northern District of Illinois, sitting by designation
 
 
 [1]
 These cases were consolidated because one of the questions--the appropriate tax treatment of stock dividends of the Chicago Federal Home Loan Bank--is presented by both taxpayers
 
 
 [2]
 The current version of section 108, as amended by the Tax Reform Act of 1986, Pub.L. No. 99-514, 100 Stat. 2085, Sec. 822(a), provides that favorable tax treatment is not available from the discharge of indebtedness unless the discharge occurs in a bankruptcy case or when the taxpayer is insolvent
 
 
 [3]
 For the relevant tax year, the early withdrawal penalty regulations provided two different possible penalties. For accounts opened before July 1, 1979, the pertinent penalty was as follows:
 For any certificate account issued after October 31, 1973 ..., a member shall impose the following conditions on any withdrawal before the end of the term or qualifying period: (1) The account holder shall receive interest or dividends from the date of issuance of the account on the amount withdrawn at a rate not exceeding the rate being paid on regular accounts; and (2) the account holder shall pay a penalty of at least (i) the interest or dividends at such rate for 90 days (3 months) on the amount withdrawn or (ii) all interest or dividends at such rate (since issuance or renewal of the certificate account) on the amount withdrawn.
 
 
 [12]
 C.F.R. Sec. 526.7(a) (1979). For accounts opened after June 30, 1979, the relevant penalty was as follows:
 For any certificate account issued, extended, or renewed after June 30, 1979, a member shall impose (except as paragraph (c) of this section provides) the following conditions on any withdrawal before the end of the term or qualifying period:
 (1) If the term or qualifying period is one year or less, the account owner shall pay a penalty on the amount withdrawn of at least 90 days (3 months) earnings on the account. If the amount withdrawn has remained on deposit for 3 months or less, all earnings shall be forfeited.
 (2) If the term or qualifying period is more than one year, the account owner shall pay a penalty on the amount withdrawn of at least 180 days (6 months) earnings on the account. If the amount withdrawn has remained on deposit for 6 months or less, all earnings shall be forfeited.
 
 
 [12]
 C.F.R. Sec. 526.7(a) (1980)
 
 
 [4]
 The issue presented here has been addressed by two other courts--the Tax Court, ruling in this case, and a single district court, Centennial Savings Bank FSB v. United States, 682 F.Supp. 1389 (N.D.Tex.1988). The court in Centennial ruled for the taxpayer, essentially adopting the argument presented by Colonial here. For the reasons set forth in this opinion, we respectfully disagree with the reasoning of the district court
 
 
 [5]
 Congress codified a predecessor to section 108 in the Internal Revenue Code of 1939. Section 22(b)(9) of that Code provided that a corporation could exclude the amount of a discharge of indebtedness from its gross income if the corporation was in an "unsound financial condition." In 1942, Congress removed the requirement that the corporation be in an "unsound financial condition." Revenue Act of 1942, ch. 619, 56 Stat. 798, Sec. 114(a). Congress made several other changes to section 108 in 1954 and in 1980, none of which are material here. In 1986, Congress came full circle and inserted a requirement that the discharge of indebtedness occur in a bankruptcy case or when the taxpayer is insolvent. Tax Reform Act of 1986, Pub.L. No. 99-514, 100 Stat. 2085, Sec. 822(a)
 
 
 [6]
 The taxpayer was not eligible for favorable tax treatment because he was not in unsound financial condition, and because he had not filed an election to adjust the basis of his assets
 
 
 [7]
 As noted earlier, this issue is also present in Colonial's appeal. For the sake of clarity, however, we shall refer only to Frontier in our discussion
 
 
 [8]
 For tax year 1978, which is at issue here, member banks had to hold stock equal to at least one-twelfth of their outstanding borrowings from the district bank. For tax year 1979, which also is at issue here, this requirement was decreased to one-twentieth of their outstanding borrowings. See 12 U.S.C. Sec. 1426(c)(2)
 
 
 [9]
 Thirteen other Tax Court judges agreed with Judge Swift's opinion, including four judges who filed a brief concurring opinion. One judge dissented
 
 
 [10]
 The Tax Court has recently reached the same result as it reached here in a case involving stock dividends of the Federal Home Loan Bank of Des Moines. Western Fed. Sav. & Loan Ass'n v. Commissioner, 55 T.C.M. 372 (1988)
 
 
 [11]
 Section 305(a) provides:
 Except as otherwise provided in this section, gross income does not include the amount of any distribution of the stock of a corporation made by such corporation to its shareholders with respect to its stock.
 26 U.S.C. Sec. 305(a).